COMMONWEALTH VS. TANZERIUS ANDERSON.

Suffolk. March 11, 2005. - September 22, 2005.

Present: MARSHALL, C.J., IRELAND, SPINA, SOSMAN, & CORDY, JJ.

*Homicide. Evidence,* Voluntariness of statement, Photograph. *Practice, Criminal,* Voluntariness of statement, Voir dire, Instructions to jury, Assistance of counsel, Comment by prosecutor, *Capital case. Constitutional Law,* Severability, Assistance of counsel.

At a murder trial, the jury had ample evidence, viewed in the light most favorable to the Commonwealth, to find present one or more of the factors listed in *Commonwealth* v. *Cunneen*, 389 Mass. 216 (1983), which assist in determining whether a murder was committed with extreme atrocity or cruelty. [200-203]

At a murder trial, the judge did not err in denying the defendant's motion to suppress a statement that the defendant had made to the police, where the evidence, which consisted of a police detective's testimony and a transcript of his interview of the defendant, was sufficient to support the conclusion that the defendant's statements were free and voluntary acts and the product of a rational intellect. [203-204]

Even if it were error for the judge at a criminal trial not to have conducted a voir dire of a certain individual, it did not influence the jury, or had but very slight effect. [204-205]

At a murder trial, the judge did not err in instructing the jury concerning the voluntariness of the defendant's statements, where the judge's reference to the defendant's competence in the totality of circumstances was sufficient to alert the jury to their consideration of the defendant's use of alcohol or drugs. [205-208]

The judge presiding over a murder trial did not abuse her discretion in admitting in evidence autopsy photographs and a crime scene photograph of the victim [208-210], nor did she err in denying the defendant's motion to sever his case from that of his codefendant [210-211].

The defendant in a murder case failed to meet his burden of demonstrating that there was a substantial likelihood of a miscarriage of justice resulting from the allegedly ineffective assistance of his counsel [211-213], and there was no merit to the defendant's claims of error at trial [213-215] and in the prosecutor's opening and closing statements [215].

INDICTMENTS found and returned in the Superior Court Department on July 25, 2000.

The cases were tried before *Barbara J. Rouse, J.*

*Robert S. Sinsheimer* for the defendant.

*Amanda Lovell*, Assistant District Attorney, for the Commonwealth.

IRELAND, J. In April, 2002, the defendant was found guilty of murder in the first degree on theories of extreme atrocity or cruelty (acting as a principal) and felony-murder (acting as both a joint venturer and a principal). He also was found guilty of armed robbery as both a principal and joint venturer and of illegal possession of a firearm as a principal.[1] On appeal, the defendant claims that the trial judge erred in submitting the case to the jury on extreme atrocity or cruelty; failing to conduct a voir dire of a witness to determine whether a statement made by the defendant was voluntary; instructing the jury concerning the voluntariness of the defendant's statements; denying the defendant's motion to suppress his statements to police; allowing certain photographs to be admitted in evidence; and denying the defendant's motion to sever his trial from that of his coventurer. He also asks us to exercise our power pursuant to G. L. c. 278, § 33E, to reverse the murder conviction and grant him a new trial. Pursuant to a pro se brief, see *Commonwealth v. Moffett*, 383 Mass. 201, 207-209 (1981), the defendant claims ineffective assistance of counsel on various grounds, errors by the judge, and prosecutorial misconduct in the opening and closing statements, and asks this court to grant him a new trial. We affirm the defendant's convictions and see no reason to exercise our power pursuant to G. L. c. 278, § 33E.

1. *Facts.* We present the essential facts the jury were warranted in finding, reserving certain details for the discussion of the issues raised.

On March 25, 2000, the defendant and sixteen year old Joleena Tate[2] went to North Conway, New Hampshire, and

---

[1]Required findings of not guilty were entered on charges of witness intimidation and armed robbery with a knife when Heather Coady became unavailable to testify. See *infra*.

The codefendant, Jason Robinson, was found guilty of felony-murder as both a principal and joint venturer, armed robbery acting as a joint venturer, and illegal possession of a firearm acting as a joint venturer. His appeal was entered in this court and is pending.

[2]At trial, Tate testified for the Commonwealth pursuant to a plea agreement. In exchange for her testimony, the Commonwealth agreed to recommend a

broke into a condominium unit belonging to Tate's father. They stole firearms and ammunition from the home, including a .357 Magnum revolver. The two also checked into the Yankee Clipper Motor Inn under the defendant's name.[3]

On the evening of March 27, 2000, the defendant brought Tate to the home of Edward Gauthier, an acquaintance he knew through Jason Robinson, his coventurer. Others were present that evening, including Robinson and Heather Coady. The group was in Gauthier's room playing video games and together smoked three or four "blunts," cigars stuffed with marijuana.

At some point in the evening, as the defendant was preparing to leave, Tate asked him if he wanted to "rob someone." The defendant agreed. Tate informed the defendant, who had invited Robinson to join them in the robbery, that she knew the victim, a Lebanese immigrant.[4] She told the pair that he carried a lot of cash and would be passive in a robbery. The three decided that Tate would contact the victim and ask him to meet her. She would then bring the victim to an apartment building located at 89 Faneuil Street (a public housing development), in the Brighton section of Boston, where the defendant and Robinson would be waiting in the hallway. They agreed that Tate would page them to indicate the time that she and the victim would be arriving. Tate testified that the plan was that once the two men arrived, she would pretend she knew nothing of the robbery and turn and walk away.

The defendant and Robinson took Tate home, where she telephoned the victim and arranged for him to pick her up. The victim took her to dinner and paid for her drinks at a restaurant in Watertown. The defendant and Robinson returned to Gauthier's home. As the defendant was leaving to make a telephone call, Gauthier heard Robinson tell the defendant to hurry back if he wanted to make some money.

---

sentence of from eight to ten years on a charge of accessory before the fact of robbery.

[3]Tate testified that, because the defendant had signed his name at the motel, if anyone asked, they would say he was visiting his cousin in Manchester, New Hampshire, a city that is nowhere near North Conway, nor is it along the same highway route.

[4]The victim had lived in the United States for thirteen years and operated a landscaping business.

In accordance with the plan, Tate used the victim's cellular telephone to reach Robinson's pager and entered "1145." When the pager "went off," Gauthier heard Heather Coady, with whom Robinson shared the pager, ask him if "1130"[5] meant anything to anyone. Robinson answered that it did.

At her request, the victim drove Tate to the designated building and parked in the driveway. She asked him to walk with her into a hallway so that she could meet a friend. He agreed. At first, Tate did not see the defendant or Robinson so she stalled for time, which included leading the victim back outside. When the defendant and Robinson showed up, Tate said to the victim, "We're being robbed." The defendant and Robinson led the victim toward the building. Tate walked in the direction of a nearby playground, where she had seen Heather Coady, to whom she had whistled and whose name she had called out. Tate testified that she called out to Coady as part of her tactic to stall the victim, hoping to make him think she was trying to get the attention of someone in the building. Just before the robbery, Gauthier, who had met Coady at the playground, noticed Robinson near the building.

About five minutes later, Tate, who was now walking with Coady, heard a very loud noise. Gauthier also heard the noise and observed the defendant and Robinson running from the building through a parking lot. Tate met up with the pair and they left in the defendant's car. When Tate asked what had happened, the defendant replied, "He's murked [dead]," and, "I got my body for the summer."

Tate testified that the defendant later stated that, while in the hallway, the men told the victim to keep his hands up and not look behind him, but that the victim kept moving his hands up and down, and had reached for the door knob. The victim kept saying that he was a good person, did not want any trouble, and knew a lot of people in the area. The defendant later told Gauthier that he believed the victim said, "Police, police." The defendant told Tate that the victim said he was not a police officer, but the defendant got nervous and shot him.[6]

When the three were driving away from the scene, the de-

---

[5]Although this discrepancy is unexplained, it is irrelevant to our analysis.

[6]All of these statements were made a day or two after the murder.

fendant removed a gun from his pocket, which Tate believed was taken from her father's home. He passed the gun to Robinson and stopped in order to hide it temporarily. The two men had the victim's wallet and found it contained forty-six dollars. They returned to the playground and Robinson asked Gauthier and Coady to help look for his watch, which he claimed to have lost. The defendant told Tate to stick to her story — that she did not see the victim after he dropped her off — because the police had no witness and no weapon.

A resident discovered the victim's body, lying in a pool of blood, outside the building at approximately 3:30 A.M. on March 28. The injuries to the victim were extensive and so severe that the man who found the body described the victim's face as "distorted" and stated that the face was not attached "as a normal face would be." The first police officer on the scene "had reason to believe," but was not sure, the victim had died of a gunshot wound.

The medical examiner determined that death was caused by the victim's heart stopping as a reflexive reaction to the gunshot, and that death was instantaneous. There appeared to be no defensive wounds. The largest of the blood spatters in the hallway was located between thirty-two to forty-seven inches from the floor. The victim was sixty-four inches tall.

Later that day, the defendant was late arriving at work, left early, and simply never returned. In the days following the murder, the defendant met with Robinson, Tate, Gauthier, and Coady. Gauthier testified that the defendant told him to stick to his story and that he should tell police that Gauthier and Coady had "had sex" that night, which was not true. As the defendant was dropping Tate off at her home, he reminded her to stick to her story and to remember that she and the defendant "didn't know each other."

There was no forensic evidence linking the defendant to the crime. The defense was that the police investigation was inadequate and that someone else committed the crimes, including, in some combination, Tate, Gauthier (both of whom, defense counsel contended, were lying), or Coady. The defendant did not testify and called only one witness, a gunsmith.

2. *Discussion.* a. *Murder with extreme atrocity or cruelty.* The defendant moved for a required finding of not guilty of murder in the first degree on the ground of extreme atrocity or cruelty at the close of the Commonwealth's case and at the close of all evidence. Both were denied. We review the denial of a motion for a required finding of not guilty to determine "whether the evidence viewed in the light most favorable to the Commonwealth could have 'satisfied a rational trier of fact' of each element of the crimes charged beyond a reasonable doubt." *Commonwealth* v. *Conkey,* 443 Mass. 60, 72 (2004), quoting *Commonwealth* v. *Latimore,* 378 Mass. 671, 677-678 (1979).

The defendant argues that because the victim died "instantaneously" of a single gunshot wound, with no evidence of defensive wounds, there was insufficient evidence to submit the case to the jury on the theory of extreme atrocity or cruelty. In the circumstances of this case, there was no error.

A jury may consider the *Cunneen* factors[7] to determine whether a murder was committed with extreme atrocity or cruelty. *Commonwealth* v. *Cunneen,* 389 Mass. 216, 227 (1983). "Our cases have generally upheld submission of the question of extreme atrocity or cruelty to the jury on the basis of even a single fatal blow." *Commonwealth* v. *Glass,* 401 Mass. 799, 802-803 (1988) (single stab wound where defendant turned the knife to inflict "more injury"). *Commonwealth* v. *Golston,* 373 Mass. 249, 259-260 (1977), cert. denied, 434 U.S. 1039 (1978) (single blow with baseball bat, delivered from behind). See *Commonwealth* v. *Auclair,* 444 Mass. 348, 361-364 (2005) (reinstating conviction on theory of extreme atrocity or cruelty where defendant delivered single blow to infant's head); *Commonwealth* v. *Eisen,* 358 Mass. 740, 746 (1971), and cases cited (submission of extreme atrocity or cruelty proper where victim killed with single blow with heavy, blunt instrument using

[7]The factors include (1) indifference to and taking pleasure in the victim's suffering; (2) consciousness and degree of suffering of the victim; (3) extent of physical injuries to the victim; (4) the number of blows delivered by the defendant to the victim; (5) the manner and degree of force with which the blows were delivered; (6) the instrument or weapon employed by the defendant; and (7) the disproportion between the means needed to cause death and those employed. *Commonwealth* v. *Cunneen,* 389 Mass. 216, 227 (1983).

moderate to severe force, splitting her skull and lacerating brain).

The defendant relies on *Commonwealth* v. *Brown*, 386 Mass. 17, 19, 28 & n.11 (1982), to support his argument. In the *Brown* case, the court held that the judge correctly instructed the jury that they could not consider the murder of the defendant's mother under a theory of extreme atrocity or cruelty because the mother died from a single gunshot from a .22 caliber rifle that struck her chin and passed through her skull, and where her body showed no other sign of injuries. The facts in the *Brown* case present no other evidence concerning the circumstances of the mother's death.[8] However, a single gunshot wound has been held to be sufficient for a conviction of extreme atrocity or cruelty. *Commonwealth* v. *Doherty*, 353 Mass. 197, 213 (1967), cert. denied, 390 U.S. 982 (1968) (sleeping victim roused and then shot at close range; jury could conclude that victim "had some awareness of what was being done to him"). In addition, the court explicitly declined to announce a rule of law that a single gunshot could never be sufficient for submission on the theory of extreme atrocity or cruelty. See *Commonwealth* v. *Blackwell*, 422 Mass. 294, 299-300 (1996) ("we cannot now imagine all the circumstances in which the *Cunneen* factors might be satisfied by such a single gunshot"). See also *Commonwealth* v. *Devereaux*, 256 Mass. 387, 394 (1926) (extreme atrocity or cruelty for jury to decide where defendant testified that victim swung a lantern at him when told to put his hands up and gunshot that hit victim was fired only to frighten victim; defendant then struck victim two or three times on the head).

In this case, there was evidence that five minutes elapsed from the time the defendant and his coventurer approached Tate and the victim, until the victim was shot. The defendant himself revealed that the victim tried to touch the hallway doorknob and was moving his hands up and down, instead of keeping them raised. The victim told the defendant that he was a good person, knew people in the area, did not want trouble, and was not a

---

[8]The death of Brown's father, who had an opportunity to say only "no" before his death from several gunshot wounds, was properly submitted to the jury on the theory of extreme atrocity or cruelty. *Commonwealth* v. *Brown*, 386 Mass. 17, 19, 28 (1982).

police officer. In his closing, the prosecutor argued to the jury the reasonable inference that the victim, a Lebanese immigrant, had an accent and that although the defendant thought that he was saying, "Police, police," what he probably was saying was, "Please, please." Even taking as fact the defendant's version of what the victim said, it was, nonetheless, a cry for help. The defendant shot the victim in the face at point-blank range, beneath his right eye. The largest blood spatter was no more than forty-seven inches high in the hallway. In addition, because of the size of the weapon, the victim's injuries were so severe that the first witnesses were not sure what caused them.[9] Moreover, after the crime, the defendant bragged that he "murked" the victim and "got my body for the summer." See *Commonwealth* v. *Golston, supra* at 260 (defendant hit the victim with baseball bat "[f]or kicks"). There was sufficient evidence to submit the case to the jury on a theory of extreme atrocity or cruelty.

From the evidence, the jury reasonably could have inferred that, in those five minutes before his death, the victim was terrified and pleading with the defendant and his coventurer. Because the defendant was able to fire the gun at a downward angle into the victim's face, and there was blood spatter located no more than forty-seven inches high in the hallway, the jury could have inferred that the victim was not standing, but perhaps kneeling. The jury reasonably could have inferred that the victim was trying to escape in reaching for the doorknob. Moreover, because the gun was held virtually against his face, the jury could infer that victim knew what was coming. Viewed in the light most favorable to the Commonwealth, the jury had ample evidence to find that one or more of the *Cunneen* factors was present (e.g., extent of victim's injuries, and manner and degree of force, as well as the defendant's statement indicating his indifference to the terror the victim experienced in those five minutes before he was shot). See *Commonwealth* v. *Evans*, 439 Mass. 184, 187, cert. denied, 540 U.S. 923, and 540 U.S. 973

---

[9]The bullet went through the facial bones, palate, and upper jaw. It struck the victim's lower jaw and ricocheted, exiting at the back of the victim's neck. The entrance wound was a six-inch laceration, up to two inches deep in places, with indications that the gun was held no less than one-half inch from the victim's face.

(2003) (victim backed away from defendant with gun, fell, and crawled into a corner begging for his life); *Commonwealth* v. *Doherty, supra.*

b. *Motion to suppress.* The defendant gave two statements to police, one on April 4, 2000, and another when he was arrested on July 17, 2000. He was given the Miranda warnings on both occasions. Portions of only the April statement, which was recorded, were presented to the jury. In that statement, the defendant said that he went to work the first few days following the murder; was at his girl friend's house several nights, including the night of the murder; that he barely knew either Tate or Coady; that he went to Manchester, New Hampshire, in March of 2000, attempting to see his uncle and, when he could not find his home, checked into a hotel; that he had never been to North Conway; and that he had not been to the Faneuil Street housing development at the time of the murder.

The defendant argues for the first time on appeal that, because the detectives who questioned him did not specifically ask his age, familiarity with the criminal justice system, whether he was under the influence of drugs or alcohol, and whether he suffered from some mental defect or deficiency, there was insufficient evidence to sustain the judge's conclusion that the defendant's statements were free and voluntary acts and the product of a rational intellect. This argument has no merit.

"The Commonwealth bears the burden of proving beyond a reasonable doubt, in the totality of the circumstances, that a defendant's waiver [of his Miranda rights] was voluntary, knowing and intelligent, and that his statements were voluntary." *Commwealth* v. *Auclair,* 444 Mass. 348, 353 (2005), citing *Commonwealth* v. *Jackson,* 432 Mass. 82, 85-86 (2000). "Absent clear error, we accept a motion judge's findings of fact . . . and a finding of voluntary waiver is given substantial deference" (citations omitted). *Commwealth* v. *Auclair, supra* at 353-354. In looking at the totality of the circumstances to determine the voluntariness of a statement, the judge may consider, among other things, the defendant's age, education, intelligence, physical and mental stability, and experience with and in the criminal justice system. *Commonwealth* v. *Magee,* 423 Mass. 381, 388 (1996), quoting *Commonwealth* v. *Selby,*

420 Mass. 656, 663 (1995). The defendant cites no authority to support his claim that the detectives should have asked him questions concerning these factors.

Here, the judge had before her the testimony of a police detective who was present while the defendant gave both statements, and a transcript of the April interview. The detective testified that the defendant did not appear to be under the influence of drugs or alcohol, that his answers seemed coherent, and that the defendant had been accepted at a local university. There was no evidence to the contrary. The detective's testimony coupled with the transcript provided ample evidence to support the judge's findings and conclusions. See generally *Commonwealth* v. *Dunn*, 407 Mass. 798, 803-805 (1990) (police officers may rely on defendant's outward appearance of sobriety when proceeding with interrogation); *Commonwealth* v. *Parker*, 402 Mass. 333, 340 (1988), *S.C.*, 412 Mass. 353 (1992), and 420 Mass. 242 (1995).

c. *Voir dire of Gauthier.* Following the murder, when the defendant, Tate, and Robinson returned to the scene of the murder to look for Robinson's watch, they encountered Gauthier and Coady. The defendant argues that the judge erred in denying the defendant's request to conduct a voir dire to determine whether statements the defendant made in Gauthier's presence were voluntary, given that the defendant and the others had consumed marijuana earlier in the evening.[10] Gauthier did not testify to the amount of marijuana the defendant consumed. The judge denied the defendant's request because there was no evidence of coercion, tricks, or force, and because she knew of no case where mere ingestion of alcohol or drugs was enough to trigger a voir dire.

An admission by a defendant to a civilian is only admissible if voluntarily made. *Commonwealth* v. *Benoit*, 410 Mass. 506, 511 (1991), citing *Commonwealth* v. *Allen*, 395 Mass. 448, 456 (1985). Statements are not voluntary if attributable to intoxication, *Commonwealth* v. *Benoit, supra*, citing *Commonwealth* v. *Hosey*,

---

[10]Two statements were at issue: The defendant asked Coady if she would help them retrace their steps to look for Robinson's watch. The defendant also stated that they "got rid of it." Gauthier was not allowed to answer to what he thought "it" referred.

368 Mass. 571, 577-579 (1975), but "intoxication alone is not sufficient to negate an otherwise voluntary act." *Commonwealth* v. *Parker, supra* at 341. However, "[i]f the defendant raises the issue of voluntariness of his . . . admission, the trial judge must hold a hearing out of the jury's presence [to] determine that the . . . admission is volunt[ary]." *Commonwealth* v. *Benoit, supra* at 511, and cases cited. The defendant "must offer some proof to support his claims." *Commonwealth* v. *Smith,* 426 Mass. 76, 82 (1997). See *Commonwealth* v. *Simmons,* 417 Mass. 60, 65 (1994), quoting *Commonwealth* v. *Blanchette,* 409 Mass. 99, 106 (1991) (where voluntariness an issue, judge should conduct voir dire); *Commonwealth* v. *Hunter,* 416 Mass. 831, 834-835 (1994), *S.C.,* 427 Mass. 651 (1998) (failure to conduct voir dire concerning defendant's statement to civilian witnesses reversible error where defendant made motion for voir dire, defendant submitted affidavit, and sole issue at trial was defendant's state of mind).

We need not decide whether the judge should have conducted a voir dire of Gauthier because, "[o]ut of an abundance of caution," the judge did conduct a voir dire of Tate, with whom the defendant spent more time that evening. The voir dire covered the defendant's participation in consuming the blunts at Gauthier's home through the defendant's participation in consuming another blunt after he, Tate, and Robinson left the playground. The judge concluded that, notwithstanding the consumption of marijuana, the defendant was not impaired and was not coerced into making statements attributed to him. The judge's conclusion that the defendant's statements were voluntary covered the same time period as the statements made in Gauthier's presence. The defendant does not challenge the judge's conclusion that the defendant's statements to Tate were voluntary, which include two statements that were much more incriminating than the statements Gauthier overheard (i.e., the victim was "murked" and the defendant "got [his] body for the summer"). However, even if it were error not to conduct a voir dire of Gauthier, for the reasons set forth above, it "did not influence the jury, or had but very slight effect." *Commonwealth* v. *Hrabak,* 440 Mass. 650, 656 (2004), quoting *Commonwealth* v. *Flebotte,* 417 Mass. 348, 353 (1994).

d. *Voluntariness instruction.* After a judge conducts a voir

dire and determines that a defendant's statement is voluntary, the question also must be submitted to the jury for a final determination of voluntariness. *Commonwealth* v. *Simmons, supra* at 65, quoting *Commonwealth* v. *Blanchette, supra* at 106. See *Commonwealth* v. *Cole,* 380 Mass. 30, 39-40 (1980), quoting *Commonwealth* v. *Marshall,* 338 Mass. 460, 461-462 (1959) (humane practice requires statements amounting to confession to be submitted to jury after judicial determination of voluntariness).

The defendant requested that the judge include specific instructions about impairment by alcohol or drugs as part of the charge on voluntariness. The judge did not include the requested instruction but instead instructed the jury as follows:

> "Now, what other considerations or instructions relate to *evaluation of the witnesses*? You have heard some testimony about statements allegedly made by *one or both of these defendants* concerning the offenses that they are charged with in this case. Before you can consider *any statements* as evidence, the Commonwealth must prove to you beyond a reasonable doubt that a defendant who is alleged to have made the statement: one, that he did make it; and two, that he made it voluntarily, freely, and rationally. And with respect to the second element you have to be persuaded beyond a reasonable doubt that *under the totality of the circumstances* the statement was the product of the defendant's free will and rational intellect.

> "The burden falls on the Commonwealth to prove beyond a reasonable doubt that a defendant's will was not overcome; that is, that he was not coerced, he was not tricked or cajoled into making the statement, and that he made that statement with a rational intellect and *when he was competent.* In addition, the Commonwealth must prove that a defendant received the Miranda warnings, that he understood them, and that he knowingly and voluntarily gave up or waived the right to remain silent.

> "If the Commonwealth does not satisfy its burden that a defendant made a statement freely, voluntarily, and as a product of his own free will and rational intellect and that he received, understood, and waived his Miranda rights,

then you may not consider those statements in any manner. If the Commonwealth has met its burden, then you may consider a defendant's statement for all purposes together will all other evidence." [Emphases added.]

The defendant argues that these instructions were defective because (1) they did not explicitly tell the jury that intoxication or impairment from alcohol or drugs is a factor that they could consider on the voluntariness requirement and (2) they may have led the jury to believe that voluntariness only applied to statements made to police because the judge discussed Miranda rights and did not explicitly tell the jury that the requirement of voluntariness applied to all statements. Defense counsel did not object to this language at trial. There was no error.

Concerning juror confusion, the judge specifically stated that the jury had to evaluate "any" statements the defendant allegedly made to "witnesses," not just to the police. The judge's reference to statements by "one or both" of the defendants made clear that the jury had to consider all statements any witness attributed to the defendant, as there was no police statement by Robinson in evidence.

Concerning intoxication, the judge told the jury that they had to consider whether the defendant's statements were given "when he was competent," and in the "totality of the circumstances the statements were a product of the defendant's free will and rational intellect." This instruction is in keeping with our case law.

In *Commonwealth* v. *Cryer*, 426 Mass. 562, 571-572 (1998), the judge twice stated that the jury could not consider any statement of the defendant unless "from 'all the evidence,' the Commonwealth had proved beyond a reasonable doubt that the defendant had made the statement voluntarily, freely, and rationally." *Id.* at 571. In that case, the defendant argued that the judge should have instructed the jury on the specific factors it should consider in determining voluntariness or at least state that the jury should consider voluntariness in the totality of the circumstances. The court rejected the argument, stating, "It may be customary, or perhaps even preferable, for judges to recite some of these factors in their instructions to the jury or to use explicitly the 'totality of the circumstances' language, but our

cases do not require more than what the judge provided here." *Id.* at 572, and cases cited.

Moreover, in *Commonwealth* v. *Doucette*, 391 Mass. 443, 456 (1984), a judge failed to instruct the jury that the Commonwealth had the burden of proving voluntariness beyond a reasonable doubt or that intoxication may be considered in determining voluntariness. The court held that the judge's instruction that the jury should consider the defendant's state of mind when determining the voluntariness of his statement to police was sufficient to apprise them of intoxication as a factor in voluntariness. *Id.* at 457. In addition, the court stated that defense counsel's closing stressed the connection between the defendant's use of alcohol or drugs and his lack of rationality. *Id.*

In this case, the judge's reference to the defendant's competence in the totality of circumstances was sufficient to alert the jury to their consideration of the defendant's use of alcohol or drugs. In addition, an instruction on intoxication may have undermined the theory of the defense that Tate and Gauthier were lying and perhaps themselves guilty. See *Commonwealth* v. *Murphy*, 426 Mass. 395, 399 (1998) (instruction on intoxication may have undermined defendant's testimony disavowing his statements to his friend); *Commonwealth* v. *Ferreira*, 417 Mass. 592, 600 n.11 (1994) (same).

e. *Admission of photographs.* At trial, the Commonwealth introduced four autopsy photographs and one crime scene photograph of the victim. The defendant objected to two photographs.[11] The defendant now argues that the judge abused her discretion in admitting all the photographs where the evidence was insufficient to support the charge of extreme atrocity or cruelty and where the photographs were duplicative, inflammatory, and prejudicial, and may have improperly influenced the jury. We disagree.

"[W]hether the inflammatory quality of a photograph

[11]Before the autopsy photographs were admitted, counsel for Robinson objected to only two of the photographs, conceding that the other two would be admissible. The defendant asked that his objection be noted as well. When the prosecutor moved to admit the four photographs during the medical examiner's testimony, only counsel for Robinson objected to admission of two photographs. Neither defendant objected to the other two.

outweighs its probative value and precludes its admission is determined in the sound discretion of the trial judge." *Commonwealth* v. *DeSouza*, 428 Mass. 667, 670 (1999), and cases cited. "In order to find an abuse of discretion, 'it is necessary to decide that no conscientious judge, acting intelligently, could honestly have taken the view expressed by [her].' " *Commonwealth* v. *Jaime*, 433 Mass. 575, 579 (2001), quoting *Commonwealth* v. *Medeiros*, 395 Mass. 336, 351 (1985). The defendant has failed to meet this heavy burden.

The judge admitted the autopsy photographs only after finding that the photographs were probative on the issue of extreme atrocity or cruelty.[12] Additionally, the judge noted that the Commonwealth exercised discretion by choosing only four of the twelve autopsy photographs. The defendant concedes that photographs depicting the force applied and injuries inflicted are properly admitted as probative on the issue of extreme atrocity or cruelty. However, he argues that the judge abused her discretion in admitting the photographs because there was insufficient evidence to support a charge of murder in the first degree on a theory of extreme atrocity or cruelty and therefore the photographs had no probative value. As discussed above, there was sufficient evidence to send the issue to the jury. Moreover, the Commonwealth proceeded on all three theories of murder in the first degree. Although the jury did not convict the defendant on the theory of deliberate premeditation, he does not argue that it was improperly before the jury. Thus, the photographs also would have been probative on that issue. See *Commonwealth* v. *Keohane*, 444 Mass. 563, 573 (2005), quoting *Commonwealth* v. *Ramos*, 406 Mass. 397, 406-407 (1990) (also probative on issue of premeditation and deliberation). Furthermore, the judge appropriately mitigated any potential prejudice by cautioning the jury not to be affected by the graphic nature of the photographs. She instructed the jury that the photographs were to be used only for whatever evidentiary value the jury determined them to have and not to base their

---

[12]The first photograph depicted the six-inch laceration on the victim's face. The second photograph depicted the medical examiner's attempt to close the wound. The third photograph depicted an abrasion on the left side of the victim's forehead. The last photograph depicted the exit wound in the neck area.

verdicts on any sympathy or emotion that might be occasioned by the photographs.

Additionally, the judge did not abuse her discretion in admitting the crime scene photograph depicting a closeup of the victim's face as seen by the first responding police officer. The Commonwealth introduced this photograph during its redirect examination of the officer, only after the defendant questioned whether the victim appeared to have a gunshot wound. The judge properly found that the photograph was not duplicative of the autopsy photographs and that the defendant's "cross-examination entitle[d] the Commonwealth to have it admitted." See generally *Commonwealth* v. *Obershaw*, 435 Mass. 794, 803-804 (2002) (where defendant contested Commonwealth's theory of events, proper to admit photographs to support Commonwealth's account of how the murder took place). Accordingly, there was no error in admitting any of the photographs.

f. *Motion to sever.* The defendant appeals from the denial of his pretrial motion to sever, arguing that admitting his codefendant's hearsay statements violated his constitutional right to confront and cross-examine witnesses against him. It is not clear what statements the defendant objects to as he fails to specify any statements in his brief and this was not the issue he raised in the motion to sever.[13] However, very few of the codefendant's statements were admitted at trial.[14] Contrary to the defendant's argument, the admitted statements neither "expressly" nor "contextual[ly]" implicate the defendant so as to offend his constitutional right to confrontation. See *Commonwealth* v. *Blake*, 428 Mass. 57, 60 (1998), and cases cited.

[13]In his motion to sever, the defendant argued that if tried together, he would be precluded from asserting that Robinson was the sole perpetrator and that Robinson's prior arrest for unlawful possession of a loaded firearm would be prejudicial. The Commonwealth responded that it had no intention of introducing Robinson's prior arrest.

[14]As Robinson did not testify, his statements came in through Tate and Gauthier. There was testimony that on the evening of March 27, 2000, when the defendant asked whether Robinson was interested in committing a robbery he said he was. Later that evening as the defendant was leaving, Robinson said that he should hurry back if he wanted to make some money. After the shooting, Robinson said he needed to go back and talk to Coady because he lost his watch. A few days after the shooting the defendant and Robinson said they disposed of the victim's wallet.

Furthermore, Robinson's statements were independently admissible against the defendant as statements of a joint venturer. "It is well settled that out-of-court statements by joint criminal venturers are admissible against the others if the statements are made 'both during the pendency of the cooperative effort and in furtherance of its goal.' " *Commonwealth* v. *Colon-Cruz*, 408 Mass. 533, 543 (1990), quoting *Commonwealth* v. *White*, 370 Mass. 703, 708-709 (1976). Although this exception to the hearsay rule "does not apply [to statements made] after the criminal enterprise has ended . . . [it] does apply where the joint venturers are acting to conceal the crime that formed the basis of the enterprise." *Commonwealth* v. *Angiulo*, 415 Mass. 502, 519 (1993), and cases cited. Here, all of Robinson's statements dealt with either planning the joint venture or attempting to conceal the joint venture after the fact. Accordingly, there was no error and the judge did not abuse her discretion in denying the motion to sever.

g. Moffett *issues.* Pursuant to *Commonwealth* v. *Moffett*, 383 Mass. 201, 207-209 (1981), the defendant raises a number of pro se issues. We deal with many of his claims of error in summary fashion because they do not rise to the level of appellate argument, as they are not supported by an affidavit or citation to authority. However, we also have examined all of the defendant's claims pursuant to G. L. c. 278, § 33E.

(i) *Ineffective assistance of counsel.* The defendant asserts various grounds for his claim that trial counsel was ineffective. When claiming ineffective assistance of counsel in a capital case, the defendant has the burden to demonstrate that there was an error during trial that created a substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *Wilson*, 443 Mass. 122, 137 (2004) (more favorable standard), and cases cited; *Commonwealth* v. *Wright*, 411 Mass. 678, 681-682 (1992). An attorney's strategic decisions are not errors unless shown to be "manifestly unreasonable." *Commonwealth* v. *Finstein*, 426 Mass. 200, 203 (1997), and cases cited. The defendant fails to meet this burden, as his arguments have no merit.

The defendant first argues that counsel should have challenged the indictment charging murder in the first degree because it lacked sufficient evidence. The indictment was proper

and in accordance with G. L. c. 277, § 79. See *Commonwealth v. Robertson*, 408 Mass. 747, 749 (1990), and cases cited (statutory form of indictment constitutionally sufficient to charge murder by whatever means it may have been committed); *Commonwealth v. McLaughlin*, 352 Mass. 218, 221-223, cert. denied, 389 U.S. 916 (1967) (motion for bill of particulars denied where murder indictment was in "statutory form," and judge refused to compel Commonwealth to answer which type of murder was alleged).[15] Contrary to his contentions, the evidence at trial was sufficient for the jury to convict the defendant of murder as alleged in the indictment. There was no error.

The defendant next argues that counsel was ineffective for failing to investigate and present various types of evidence.[16] Because the defendant failed to provide any affidavits or other evidence in support of his contention, it is not clear what his counsel failed to investigate, what such investigations would have produced, or to what these witnesses might have testified. See *Commonwealth v. Ortega*, 441 Mass. 170, 178-179 (2004), and cases cited (defendant must show purported testimony would have been relevant or helpful). The defendant's unsupported speculations fail to satisfy his burden. See *Commonwealth v. Lynch*, 439 Mass. 532, 539, cert. denied, 540 U.S. 1059 (2003).

The defendant's final argument is that trial counsel was ineffective for failing timely to challenge the unreliability and admissibility of scientific evidence concerning his handwriting samples. In particular, the expert testified that the signature from the records of the North Conway motel was the defendant's. Various samples of the defendant's handwriting were in evidence for the jury to view and from which to draw their own conclusions. Moreover, this testimony was cumulative. The jury did not need to find that the defendant had signed the motel receipt to place him there. They could have believed

---

[15] The defendant's reliance on *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and *Prou v. United States*, 199 F.3d 37 (1st Cir. 1999), is misplaced as both cases discuss enhanced sentences, which is not an issue in this case.

[16] Specifically, the defendant argues that counsel was ineffective for failing to investigate and present an alibi defense, to present character evidence, and to investigate and present witnesses who would have raised a reasonable doubt.

Tate's testimony. The defendant failed to meet his burden of demonstrating that there was a substantial likelihood of a miscarriage of justice.

(ii) *Trial errors.* The defendant claims that the judge made several errors during the trial. We consider each in turn.

The defendant argues that it was prejudicial error for the judge to instruct the jury that they could find malice (for either murder in the first degree on the theory of extreme atrocity or cruelty or murder in the second degree) if the Commonwealth had proved beyond a reasonable doubt that the defendant intended to cause the death of, or grievous bodily harm to, the victim (first and second prong malice). The defendant has confused third prong malice with second prong malice. These instructions were proper. *Commonwealth* v. *Williams,* 428 Mass. 383, 386 (1998) ("The first two prongs of malice are intent to kill and intent to cause grievous bodily injury"); *Commonwealth* v. *Grey,* 399 Mass. 469, 469-470 (1987) (malice required for murder in the second degree). The judge did not instruct on third prong malice.

The defendant also claims two errors concerning the judge's instructions on possession of a firearm. Without citation to authority, he claims that the judge's statement that whether the defendant had a license was not an issue improperly shifted the burden to the defendant to prove he had a license.[17] Second, he argues that the judge left out an element of the crime from her instruction, namely that the defendant possessed the firearm outside his residence or place of business.[18] Concerning the first issue, we disagree that the judge's instruction improperly shifted the burden to the defendant. Absence of a license is not an element in the offense of unlawfully carrying a firearm. The burden, in any event, is on the defendant to come forward with evidence of a license. *Commonwealth* v. *Jones,* 372 Mass. 403,

---

[17]The judge stated: "Third, and finally, the Commonwealth must prove beyond a reasonable doubt that the defendant knew that he possessed a firearm, that he possessed it voluntarily, consciously, and purposefully. There is no evidence in the case that the defendant had a license and for that reason the issue of a license is not relevant to your determinations in the case. It therefore should not be considered by you."

[18]The judge mentioned residence at the beginning of this instruction when she was "paraphrasing the indictment."

406 (1977) (once defendant offers evidence of license, prosecutor must persuade trier of fact beyond reasonable doubt that license does not exist). If there is no evidence of a license, there is no issue for the jury. *Id.* at 407. The instruction was proper.

Likewise, the judge's omission of an instruction concerning residence was proper. Residence also is a statutory exemption for the charge of illegally possessing a firearm. *Commonwealth* v. *Moore*, 54 Mass. 334, 342-344 (2002), citing G. L. c. 269, § 10 (*a*) (reversing conviction where judge's answer to jury's question concerning whether a roommate's bedroom qualified as the defendant's residence could have misled jury). As such, it is an affirmative defense, which the defendant did not put forward, and nothing in the evidence pointed to his meeting this exemption. The instruction was proper. See *Commonwealth* v. *Sann Than*, 442 Mass. 748, 752 (2004) (listing elements of unlawful possession of a firearm).

At trial, the judge denied the defendant's motions in limine, which requested exclusion of evidence of the theft of guns in New Hampshire and a conversation he had with Tate some time before the murder (and the theft) about forming a criminal enterprise to sell drugs and rob drug dealers. The defendant's cursory statement that the judge's admission of evidence of prior bad acts, having no bearing on his identity, motive, or knowledge, was prejudicial, does not rise to the level of appellate argument. In any event, the judge instructed the jury that although they heard evidence concerning other acts by the defendant, he was not charged with those acts and they could not use any of those acts as proof that he committed the crimes with which he was charged. Juries are presumed to follow a judge's instructions. *Commonwealth* v. *Auclair*, 444 Mass. 348, 360 (2005). There was no error.

Without citation to authority (or to the record), the defendant claims that the judge committed prejudicial error in allowing Sergeant Detective Daniel Coleman of the Boston police department to sit at the prosecutor's table to assist at trial. Coleman also was a witness in the case, as he coordinated the units assigned to investigate the murder. The defendant's cursory statement does not rise to the level of appellate argument, Mass.

R. A. P. 16 (a) (4), as amended, 367 Mass. 921 (1975), and we need not consider it. *Commonwealth* v. *Simpson*, 434 Mass. 570, 577 n.3 (2001), citing *Commonwealth* v. *Bowler*, 407 Mass. 304, 310 (1990) ("argument not supported by reasoned argument or citation . . . does not constitute proper appellate argument").

(iii) *Prosecutor's opening and closing statements.* The defendant claims numerous errors in the prosecutor's opening and closing statements. We need not belabor the issues he raises because most of them are claims that the prosecutor argued facts not in evidence, when in fact they were either in evidence, a reasonable inference from the evidence, *Commonwealth* v. *Rivera*, 430 Mass. 91, 101 (1999), or a reasonable answer to a defense attack on a witness, *Commonwealth* v. *Ortega*, 441 Mass. 170, 181 (2004), and cases cited. In addition, although there was a minor misstatement by the prosecutor, concerning whether Gauthier and Tate were good friends or just acquaintances, the jury were instructed that closing arguments were not evidence. *Commonwealth* v. *Auclair, supra* at 358, and cases cited ("We consider a prosecutor's closing in the context of the entire argument, the evidence, and the judge's instructions"). In addition, the jury heard Tate's testimony stating that she and Gauthier were friends and the judge instructed the jury that they were the ones who determine the facts. Finally, the defendant raises the issue of the prosecutor's stating in his opening what Heather Coady would testify to and then failing to call Coady as a witness. The defendant's argument that the prosecutor knew that Coady was not going to testify is without merit. The day she was to appear at trial she took an overdose of drugs and her attorney told the judge that Coady was going to be hospitalized for psychiatric evaluation and, in any event, would exercise her right under the Fifth Amendment to the United States Constitution.[19]

3. *General Laws c. 278, § 33E.* We have reviewed the entire record and considered all the defendant's claims of error pursu-

---

[19]Moreover, Coady's inability to testify led to required findings of not guilty being entered on two charges. See note 1, *supra*.

445 Mass. 195 (2005)

ant to G. L. c. 278, § 33E. We find nothing indicating a substantial likelihood of a miscarriage of justice and see no reason to reduce the murder verdict or order a new trial.

*Judgments affirmed.*