Curran, Dennis J., J.
Dorothy and Barbara Rouleau have sued the state Department of Developmental Services over the transfer of Margaret Rouleau from the Fernald Developmental Center to the Wrentham Developmental Center in Wrentham, Massachusetts. The Rouleaus have moved to stay the transfer of Margaret Rouleau pending the outcome of their challenge under G.L.c. 30A to the decision of the Division of Administrative Law Appeals (“DALA”), which approved the Department’s move to transfer her.
For the following reasons, the Rouleau’s motion must be DENIED.
BACKGROUND
Margaret Rouleau
Margaret Rouleau is an 85-year-old woman with a moderate intellectual disability who has resided at Fernald for about 65 years. DALA Decision at 5-6. Although her overall health has currently been described as “stable,” Ms. Rouleau suffers from a number of health disorders, including Ttype II diabetes, rigid scoliosis, hypertension, significant hearing loss in the right ear, reduced sight in the right eye, and diverticulitis. DALA Decision at 6-7; Antanitus Affidavit ¶5. Furthermore, she has a history of frequent urinary tract infections, pneumonia, and breast cancer. DALA decision at 6-7. She also suffers from decubitus, a serious skin disorder which leads to the breakdown of the skin as a result of spending long periods of time in a single position. Id. As a result of this predisposition, Ms. Rouleau sleeps on a special air-flow mattress which reduces the likelihood of skin breakdown by evenly distributing pressure along her body, and her skin must be conditioned by special staff on a daily basis. DALA decision at 7. Due to her numerous medical conditions, Ms. Rouleau uses a large, motorized wheelchair which she controls herself with the occasional assistance of facility staff. DALA decision at 6.
Notwithstanding her physical ailments, Ms. Rouleau is both verbal and social. DALA decision at 6. She can carry on basic conversations, and enjoys myriad social activities: she likes going shopping, listening to music, and has previously gone on annual overnight trips to Cape Cod. DALA decision at 7-8. However, she did not go to Cape Cod in 2013 because the previous year’s trip resulted in significant mental confusion for several weeks afterwards. Id. In addition, Ms. Rouleau works five days a week assembling HIV kits for the *345 Department of Public Health, and is proud of her duties. DALA decision at 15-16. She also regularly-attended Mass at Fernald until the facility’s chapel closed in 2013. DALA decision at 9. She is currently attending Mass at a different building on the Fernald campus. Id. However, this service will most likely cease in the near future, forcing Ms. Rouleau to attend Mass off-site. DALA decision at 9; Kingston Affidavit ¶ 7.
Ms. Rouleau is classified as a Ricci class member, which entitles her to support from the Department for the entirety of her life. DALA decision at 9. As part of this support by DDS, Ms. Rouleau’s guardians and medical team have created an Individual Support Plan which identifies her needs, relationship objectives, and defines her participation in the larger community. Id. Six objectives have been designed to further her personal well-being, communiiy membership and personal growth needs: (1) Ms. Rouleau identifies and purchases certain items related to her daily living; (2) counts to 11 the number of HIV kits she prepares as part of her work; (3) correctly names and evaluates medications given to her; (4) cleans her space at a dining table following her meal after being given a verbal cue; (5) improves her left arm’s range of motion with the assistance of an occupational therapist; and (6j keeps a steady beat to a short song with the help of a manual metronome. DALA decision at 9-10.
Fernald and Its Closure
Fernald Developmental Center is an Intermediate Care Facility for the Mentally Retarded (ICR/MR) in Waltham, Massachusetts, and has been in operation for over 120 years. DALA decision at 4. In 2003, the Massachusetts legislature directed the Department to close or consolidate 6 ICR/MRs in an effort to reduce costs and reduce or eliminate discrimination against the mentally-disabled and encourage their integration into the community. DALA decision at 4-5. The Department originally intended to move Fernald residents to one of the other ICF/MRs, or to a “community-based setting.” Id. This move was vigorously contested by several years of litigation, which was resolved eventually by the United States Court of Appeals for the First Circuit’s decision in Ricci v. Patrick. DALA decision at 4-5; Ricci v. Patrick, 544 F.3d 8, 17 (1st Cir. 2008). That Court held that the Department could close Fernald provided the residents which were to be transferred were given “equal or better” service. Ricci, 544 F.3d at 17. Consequently, the gradual closure of Fernald has continued; although it once contained almost 2,000 persons in 68 buildings, Fernald now only operates a handful of buildings, and houses only two patients, one of which is Ms. Rouleau. DALA decision at 4-5; Kingston Affidavit ¶7. Fernald also suffers from frequent power plant problems. DALA decision at 4-5. In 2012, a steam leak forced Ms. Rouleau and other residents from Cottage 9 to Malone Park 23, where she currently resides. Id. This relocation was difficult for Ms. Rouleau because of its abruptness, and left her in a confused state for several weeks afterwards. DALA decision at 12. Furthermore, the reduced staff on hand at Fernald has left it vulnerable; squatters and homeless people live in abandoned parts of the facility, while copper thieves and vandals have ransacked individual buildings. Kingston Affidavit ¶5. The loss of other patients and staff have progressively limited the number of social activities available to Ms. Rouleau. Kingston Affidavit ¶¶12-14.
On April 26, 2013, the Department notified Ms. Rouleau’s guardians of its intent to transfer her to Wrentham under the authority of G.L.c. 123B. DALA decision at 2. They objected to the transfer. Id. The Department referred the matter to DALA, which held a hearing in accordance with G.L.c. 123B, §3, ¶¶2-3. Id. DALA conducted three days of hearings and took live testimony from over 20 witnesses. Over 30 exhibits of evidence were introduced. The magistrate personally inspected both Fernald and Wrentham. DALA decision at 2-3. And, as part of her analysis, the magistrate conducted a side-by-side comparison of the various aspects of Wrentham and Fernald with regard to Ms. Rouleau’s quality of life, and found the following:
Residence: The living space at Wrentham would be a small diminishment in services for Ms. Rouleau even though the proposed bedroom space would be roughly the same size, and would fulfill the requirements of her Support Plan. DALA decision at 31.
Staff: There would be no change in services with regards to staff; Ms. Rouleau would know two direct care staff at Wrentham, and additional members would become familiar with her over time. DALA decision at 32-33. While there are more familiar staff at Fernald currently, high turnover rates and the downsizing of the facility have reduced their number. DALA decision at 32-33; Kingston Affidavit ¶¶12~14.
Medical and Nursing Support: Wrentham would be an improvement over Fernald. For example, Wrentham possesses 24-hour nursing care, and has the May Center, which would provide a level of care similar to a hospital. DALA decision at 33-34. Furthermore, there has never been an occurrence of skin breakdown at Wrentham due to staff diligence, but there have been two occurrences of skin breakdown at Wrentham within the past five years. Id. Consequently, the constant medical attention which Ms. Rouleau requires on account of her myriad medical conditions is best served by the Wrentham facility. Id.
Vocational Program, Rehabilitative Services, Leisure, and Recreational Activities: The work offered to Ms. Rouleau at Wrentham would likely be seen by her as a “demotion,” but her Support Plan counting objective would be maintained. DALA decision at 34. Secondly, Wrentham staff are required to spend half of their work hours with residents, which is not *346 the case at Fernald. Id. Finally, Ms. Rouleau could participate in a wide range of activities at Wrentham. Id. This is not possible at Fernald, where a skeleton crew of staff and the only one other resident precludes large social activities and are obviously isolating Ms: Rouleau. DALA decision at 35. DALA also noted that Ms. Rouleau was aware of this progressively severe isolation. Id.
The DALA decision recognized that these factors alone would not allow the transfer to go forward. DALA decision at 37. However, the magistrate noted that the presence of a critical factor “tips the balance in Wrentham’s favor”:
Fernald cannot offer a stable environment. It is better for Margaret R[ouleau] to leave Fernald now, while is in fragile, but stable health, rather than in the future when, as she ages, her health and her ability to weather the transition may worsen. Margaret R[ouleau] has had difficulty with transitions in her living and work environments, yet she also has shown some resiliency. If the transition is managed well and progresses at her pace, she will adjust.
DALA at 37; accord Antanitus Affidavit ¶¶6-11. As required by G.L.c. 123B, §3, DALA also considered the obj ections of the Rouleaus to her transfer to Wrentham and addressed their objections:
First, DALA refuted the objection that the longer travel time would result in less visits, stating that the projected travel time was “not dissimilar,” and that the co-guardians chose how often to visit Ms. Rouleau. DALA decision at 35.
Second, the Rouleaus objected to the loss of services at Fernald’s chapel. DALA noted the loss of “familiar surroundings,” but stated that “what is important is that Catholic services are available at Wrentham to serve [Ms. Rouleau’s] spiritual needs.” Id-
Third, DALA found the Rouleau’s objection that Ms. Rouleau would not tolerate an overnight vacation irrelevant, because she is not required to go on overnight vacations. Id.
Fourth, DALA found that the Rouleaus failed to demonstrate validity to their claim that the fire evacuation plan was inadequate or potentially harmful. See id.
Finally, the Department properly addressed a miscellany of less significant legal and procedural objections which need not be repeated. See DALA decision at 36.
DALA concluded that the Department had met its appropriate burden under G.L.c. 123B. DALA decision at 37-38. It established by a preponderance of the evidence that the proposed transfer of Ms. Rouleau to Wrentham would lead to a higher quality of life, and serve her best interests. Id. The Rouleaus appealed and filed this lawsuit.
DISCUSSION
The rules governing a stay of transfer pending an appeal are not specified in the statute governing transfer protocol besides the admonition to “hear such an appeal as expeditiously as possible in open court or in chamber.” G.L.c. 123B, §3. Therefore, the most appropriate standard arises out of Hilton v. Braunskill 481 U.S. 770, 776 (1987). There are four factors:
A petitioner must demonstrate (1) that he is likely to succeed on the merits of his underlying objection; (2) that he will suffer irreparable harm absent the stay; (3) that this harm outweighs any potential harm fairly attributable to the granting of the stay; and (4) that the stay would not disserve the public interest.
However, a stay is not a matter of right. Virginian R. Co., 272 U.S., 658, 672 (1926). Rather, it is “an exercise of judicial discretion,” and “[t]he propriety of its issue is dependent upon the circumstances of the particular case.” Id., at 672-73; see Hilton, supra, at 777. Moreover, the party requesting a stay bears the burden of showing that the circumstances justify an exercise of that discretion. Clinton v. Jones, 520 U.S. 681, 708 (1997).
Likelihood of Success on the Merits
The United States Supreme Court has ruled that the moving party’s likelihood of success on the merits is one of the most important parts of the four-pronged test. See Nken v. Holder, 556 U.S. 418, 434 (2009). In fact, courts have at times only analyzed this one factor and found it dispositive. See Latino Political Action Committee, Inc. v. Boston, 716 F.2d 68, 70 (1st Cir. 1983); Wilson v. Transitional Assistance, 441 Mass. 846, 858-59 (2004). The Rouleaus do not claim that they have a strong likelihood of success on the merits of this case, but rather claim that the transfer at present would “utterly destroy” the status quo, and “irreparably harm[ ] [Ms. Rouleau].” Motion to Stay at 2. This allegedly irreparable harm in turn absolves them from having to demonstrate an absolute probability of success. Motion for Stay at 2; See Nken v. Holder, 556 U.S. at 434. On the contrary, a stay, as a matter of judicial discretion, may be denied even if irreparable injury might otherwise result. Virginian, 272 U.S. at 672. Statutory law requires that the conclusion of an administrative agency be assessed only to see if it is supported by “substantial evidence.” G.L.c. 30A, §14(7)(e). If that requirement is met, no court can “substitute [its] view of the facts.” Duggan v. Board of Registration in Nursing, 456 Mass. 666, 673-74 (2010). An agency’s decision is not easily overturned by an appellate court because of the agency’s high degree of experience, technical competence, and specialized knowledge. Id. Consequently, the Rouleaus bear a heavy burden to demonstrate the invalidity of an agency decision, and must demonstrate that there is a reasonable possibility of success on the merits of the case. G.L.c. 30A, §14(7); see J.W. v. Dept. *347 of Developmental Servs., 84 Mass.App.Ct. 340, 344-45 (2013).
There is both ample and recent judicial precedent in this situation, and it does not favor the Rouleaus. See E.G. v. Department of Dev. Serv., 84 Mass.App.Ct. 831, 832 (2014); Randall R. v. Department of Dev. Servs, 84 Mass.App.Ct 1110, 2014 WL 4835168. In many cases involving Fernald residents, the Appeals Court has rejected arguments not dissimilar from the Rouleaus, particularly those criticizing the thoroughness and credibility of the DALA review along substantial-evidence lines. See P.D. v. Department of Dev. Servs., 84 Mass.App.Ct. 822, 829-30 (2014); M.M v. Department of Dev. Servs., 84 Mass.App.Ct. 809, 821 (2014). For virtually each challenge against the Department, the Appeals Court ruled that the agency’s conduct had fully complied with the relevant statutes by conducting a thorough and unbiased assessment of all the relevant evidence. Id.
Such is the claim being made here, as the Rouleaus merely disagree with the conclusions of the DALA magistrate based on their subjective view of the evidence. See P.D. v. DDS, 84 Mass.App.Ct. at 829-30; M.M v. DDS, 84 Mass.App.Ct. at 821. Yet the majority of the evidence supports DALA’s conclusion. See DALA decision at 35-38. DALA thoroughly assessed all aspects of the proposed transfer and its effect on Ms. Rouleau. DALA decision at 3-5. It called over 20 witnesses and introduced over 30 exhibits. Id. The magistrate also visited both facilities, and considered the Rouleaus’ objections. DALA decision at 3-4, 35-36. Although the Rouleaus cite several portions of the DALA decision which state that aspects of Wrentham are a diminishment of the services at Fernald, and would impact Ms. Rouleau’s quality of life, this selective use of the magistrate’s report truly ignores the complete picture of Ms. Rouleau’s situation. Motion to Stay at 3; see DALA decision at 35-38. Although the Department found that a few services at Wrentham would be equal to or a slight diminishment of the services at Fernald, the DALA magistrate also concluded that several aspects of Wrentham were far superior to Fernald, especially those areas dealing with nursing support, social activities, and recreational activities. Id. Furthermore, the Rouleaus omit a decisive consideration of the DALA magistrate, namely that transferring Margaret to Wrentham when her health is stable would be better for her long-term welfare compared to risking a transfer after months or even years of litigation, during which time her health might be more fragile. DALA decision at 37-38; Antanitus Affidavit Sil 1.
The Rouleaus claim that DALA’s decision is “arbitrary and capricious” as well as an “abuse of discretion.” Rouleau Memorandum on Motion to Stay at 4. Unfortunately, these conclusory terms represent standards of review which are actually more lenient towards the agency than the substantial evidence standard. SeeG.L.c. 30A, Duggan v. Bd. of Registration in Nursing, 456 Mass. 666, 674 (2010). “In order to find an abuse of discretion, it is necessary to decide that no conscientious judge, acting intelligently, could honestly have taken the view expressed by him.” Commonwealth v. Anderson, 445 Mass. 195, 209 (2005). Regarding the standard for arbitrary and capricious, “a decision is arbitrary if an important aspect of a problem is not considered or if the decision ‘is so implausible that it could not be ascribed to a difference in view.’ ” Motor Vehicle Mfrs. Ass’n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983). Neither of these definitions remotely apply to the DALA decision, considering the sizable amount of supporting evidence. See Motor Vehicle Mfrs. Ass’n, 463 U.S. at 43; Commonwealth v. Anderson, 445 Mass. at 209. On the contrary, the thorough and objective review of the proposed transfer by DALA cannot be overturned by selecting a few short excerpts of that opinion. See id. Thus, in keeping with prior cases which presented similar arguments, the Rouleaus do not possess a consequential likelihood of success on the merits of their case. See id.
Presence of Irreparable Harm
The Rouleaus next claim that Ms. Rouleau should not be moved because any move now would deprive her of her statutory appellate rights. Memorandum on Motion to Stay at 5. Yet the very case which they cite for that argument establishes that “what matters as to each party is not the raw amount of irreparable harm the party might conceivably suffer, but rather the risk of such harm in light of the party’s chance of success on the merits.” American. Grain Products Processing Institute v. Department of Public Health, 392 Mass. 309, 327 (1984). Therefore, this issue is essentially moot. Id. The failure of the Rouleaus to demonstrate a reasonable chance of success on the merits notwithstanding, Ms. Rouleau will not suffer irreparable harm if transferred now, but may likely see an improved quality of life. See Kingston Affidavit ¶¶12-15; Antanitus Affidavit ¶¶9-11. Her current position at Fernald is precarious. Id. She has virtually no other patients with whom to interact, and the number of familiar staff have declined over time. See Kingston Affidavit T3I12-15; Antanitus Affidavit 19. The aged facility is vulnerable to power plant interruptions which have previously forced Ms. Rouleau to move to a different building, causing emotional trauma. DALA decision at 3-4. Moreover, the majority of the witnesses interviewed as part of the DALA decision concluded that the transfer of Ms. Rouleau to Wrentham was in her best interest, including her primary physician, Dr. Antanitus, who stated that there would be improved medical services available to her there. DALA decision at 33, 36-37; Antanitus Affidavit ¶9-11. He went on to assert that Ms. Rouleau’s health was more conducive to a transfer at present, rather than at an undetermined point in the future. Antanitus Affidavit Sill. *348 Together with the deteriorating environment at Fernald, Dr. Antanitus’s professional opinion with respect to Ms. Rouleau’s best interest and the potential move is decisive. See Antanitus Affidavit ¶11; Davidson v. Howe, No. 13-2365. Thus, Ms. Rouleau will not suffer irreparable harm if the stay is not granted. Id.
Public Interest
Finally, a court must consider the public interest while evaluating a motion for a stay. Nken, 556 U.S. at 434; Cote-Whitacre v. Department of Pub. Health, 446 Mass. 350, 357 (2006). The Rouleaus claim that the stay will not affect the Department or the public interest significantly. Motion to Stay at 5-6. However, the public interest certainly favors a transfer in this situation. Kingston Affidavit ¶¶4, 11. The closing of Fernald, having been delayed many times by litigation, has taken over 10 years. DALA decision at 4-6. Furthermore, Margaret Rouleau is only one of two individuals remaining at Fernald, which at one time held around 2,000 persons. Kingston Affidavit ¶11. By forcing Fernald to remain open, their presence currently costs the Department $3.6 million annually to operate. Id. Moreover, because Fernald’s census is below four, it does not qualify as an “ICF” subject to Title XIX and federal Medicaid regulations and consequently, it is no longer eligible for federal funds. Kingston Affidavit, paragraph 10. If Fernald were closed, the money saved could then be spent on improved services for other patients throughout the state. See Ricci Disengagement Order, ¶5, 823 F.Sup. 984, 987 (D.Mass. 1993). While Ms. Rouleau and the other patient continue to receive care at Fernald as legally required, the quality of their care is obviously decreasing because of the reduction of familiar staff, health care specialists, and a nearly-complete lack of social opportunities. Kingston Affidavit ¶¶14-15. Therefore, transferring Ms. Rouleau will not only be in her best interest, but will also allow for the re-allocation of funds to other equally deserving individuals, furthering the public interest. See Ricci Disengagement Order, ¶5, 823 F.Sup. at 987; Kingston Affidavit ¶¶14-15. These are not insignificant public policy considerations.
ORDER
For these reasons, the Rouleau’s motion for stay of transfer pending the appeal of this case must be DENIED.