# United States Court of Appeals

## For the First Circuit

No. 07-2522

ROBERT SIMPSON RICCI, ET AL.,

Plaintiffs, Appellees,

v.

DEVAL L. PATRICK, in his capacity as Governor
of the Commonwealth of Massachusetts, ET AL.,

Defendants, Appellants.

No. 07-2523

MASSACHUSETTS ASSOCIATION FOR RETARDED CITIZENS, INC.,
a/k/a Arc/Massachusetts, Inc., ET AL.,

Plaintiffs, Appellants,

DISABILITY LAW CENTER, INC.,

Intervenor, Appellant,

v.

DEVAL L. PATRICK, in his capacity as Governor
of the Commonwealth of Massachusetts, ET AL.,

Defendants, Appellants.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Joseph L. Tauro,  U.S. District Judge]

Before

Lynch, <u>Chief Judge</u>,
Selya, <u>Circuit Judge</u>,
and Schwarzer,[*] <u>District Judge</u>.

_____

        <u>Robert L. Quinan, Jr.</u>, Assistant Attorney General, with whom <u>Marianne Meacham</u>, Special Assistant Attorney General, and <u>Martha Coakley</u>, Attorney General, Commonwealth of Massachusetts, were on brief for appellants Deval L. Patrick, et al.
        <u>Steven J. Schwartz</u> with whom <u>Robert D. Fleischner</u>, <u>J. Paterson Rae</u>, <u>Center for Public Representation</u>, <u>Richard M. Glassman</u>, <u>Matthew Engel</u>, and <u>Disability Law Center</u>  were on brief for appellants Massachusetts Association for Retarded Citizens, Inc. and Disability Law Center.
        <u>Jeffrey S. Follett</u>, <u>Ramzi B. Ajami</u>, <u>Foley Hoag LLP</u>, <u>Judith A. Gran</u>, and <u>Public Interest Law Center of Philadelphia</u> on brief for National Association of State Directors of Developmental Disabilities Services, amicus curiae.
        <u>Joshua S. Krumolz</u>, <u>Lawrence R. Kulig</u>, <u>Gillian Rattray</u>, <u>Edwin L. Hall</u>, and <u>Holland & Knight LLP</u> on brief for Association of Developmental Disabilities Providers, et al., amici curiae.
        <u>Dana A. Curhan</u> with whom <u>Beryl W. Cohen</u> was on brief for appellees Robert Simpson Ricci, et al.
        <u>Daniel J. Brown</u> with whom <u>Margaret M. Pinkham</u> and <u>Brown Rudnick Berlack Israels LLP</u> were on brief for appellee Wrentham Association for Retarded Citizens, Inc.
        <u>Thomas J. Frain</u> and <u>C. Alex Hahn</u> on brief for Massachusetts Coalition of Families and Advocates for the Retarded, Inc., et al., amici curiae.

_____

October 1, 2008

_____

_____

        [*]    Of the Northern District of California, sitting by designation.

-2-

**LYNCH**, **Chief Judge**.  The Governor of Massachusetts and the state Department of Mental Retardation ("DMR") appeal from an order of a federal district court which both reopens a 1993 consent decree and then requires them to take certain steps as to the residents of the Fernald Development Center.  Ricci v. Okin (Ricci IV), 499 F. Supp. 2d 89 (D. Mass. 2007).  Appellants, whom we shall call the Commonwealth, deny that the court had any authority to reopen the consent decree or otherwise issue any orders.

The Commonwealth characterizes the order as essentially prohibiting it from relocating residents as it attempts to close the Fernald Development Center.  The Fernald Center, some 160 years old, has been the residence of over 180 mentally retarded residents committed to the care of the Commonwealth.  The Commonwealth announced, in 2003, its intention to move these residents to one of the five other residential facilities or to a community based setting, whichever comports best with each resident's individual service plan ("ISP").  The Commonwealth has committed itself to transferring residents only if the Superintendent at Fernald "certifies that the individual to be transferred will receive equal or better services to meet their needs in the new location."  Ricci v. Okin (Ricci III), 823 F. Supp. 984, 987 (D. Mass. 1993).  The Commonwealth did transfer, in fact, some 49 Fernald residents before February 8, 2006.

The federal district court, which has conscientiously and with great care presided over institutional reform litigation concerning these mentally retarded persons since 1972, see generally Ricci v. Okin (Ricci I), 537 F. Supp. 817, 819 (1982), closed the underlying case in 1993 pursuant to a consent decree whose terms it adopted into a court order known as the Disengagement Order, see Ricci III, 823 F. Supp. at 986-89.

Nonetheless, in 2006, the court enjoined the Commonwealth from transferring any more residents on the motion of a class of Fernald residents alleging violation of the decree. Ricci v. Okin, Nos. 72-0469-T, etc. (D. Mass. Feb. 8, 2006) (order freezing resident transfers and appointing court monitor). The court found that it had authority under the 1993 Disengagement Order to investigate whether, as the plaintiffs alleged, the Commonwealth was violating the Disengagement Order. The court appointed a monitor, the U.S. Attorney for Massachusetts, to investigate and prepare a report. The court asked the monitor's report to address "whether the past and prospective transfer processes employed by the Department of Mental Retardation comply with federal law, state regulations, as well as the orders of this court." Id. The district court's authority to investigate the allegations of violation is not at issue.

After receiving the report, the court, in an order dated August 14, 2007, found that the conditions for reopening the case

contained in the Disengagement Order had been met.  It also issued a further remedial order, the specific terms of which we describe later.  Ricci IV, 499 F. Supp. 2d at 92.  Those orders are at issue.

The Commonwealth's appeal is from both components of the August 14, 2007 order.  The appeal is supported by a number of amici who are of the view that deinstitutionalization is in the best interests of the Fernald residents.[1]  In addition, the Massachusetts Association of Retarded Citizens, Inc. appeared as a plaintiff-appellant urging reversal.  The Disability Law Center appeared as an intervenor-appellant also urging reversal.

On the other side, the plaintiffs' arguments to uphold the district court's decision are supported by other amici.[2]  In addition, the Wrentham Association for Retarded Citizens, Inc. appeared as a plaintiff and appellee on behalf of a class composed

---

[1]  Amici in support of the Commonwealth are:  National Association of State Directors of Developmental Disabilities Services; Association of Developmental Disabilities Providers of Massachusetts; Adlib, Inc.; The Arc of the United States; Boston Center for Independent Living; Independent Living Center of the North Shore and Cape Ann, Inc.; Massachusetts Advocates Standing Strong; Massachusetts Council of Human Service Providers, Inc.; Massachusetts Families Organizing for Change; MetroWest Center for Independent Living, Inc.; National Disability Rights Network; Northeast Independent Living Program; Service Employees International Union; Local 509 of the Service Employees International Union; Stavros Center for Independent Living; and United Cerebral Palsy.

[2]  Amici in support of the plaintiffs are:  Massachusetts Coalition of Families and Advocates for the Retarded, Inc.; and Voice of the Retarded, Inc.

of residents at the Commonwealth's Wrentham Development Center, stating that in its view, the issues involved in this case affected residents in other state institutions for the mentally retarded such as Wrentham.

We review first whether the district court had authority to reopen this case because the Commonwealth violated the Disengagement Order or the residents' constitutional rights and whether the court had authority to reopen on some other basis. Because we conclude there was no basis for the district court to reopen the case or otherwise assert jurisdiction, we do not reach the issues relating to the remedial order. We reverse the district court, vacate its order, and order dismissal of these proceedings for lack of jurisdiction.

I.

We set forth the factual background for this suit, starting with the events which precipitated these proceedings.

A.      <u>Actions By the Commonwealth Which Led to This Action</u>

In three budgetary acts from 2004-2007, the Massachusetts legislature directed DMR to take appropriate steps to consolidate or close its six Intermediate Care Facilities for the Mentally Retarded ("ICFs"), including Fernald. Several reasons were articulated. The legislation stated one purpose of the directive was to promote compliance with a Supreme Court decision, <u>Olmstead</u> v. <u>L.C. ex rel. Zimring</u>, 527 U.S. 581 (1999). That decision, in

-6-

turn, emphasized the congressional intent in Title II of the Americans with Disabilities Act of 1991 ("ADA") to avoid discrimination against mentally disabled persons by promoting their placement into community settings. Another stated purpose was to further the Commonwealth's own established policy of reducing its institutional capacity and of providing services to patients in less restrictive settings. This policy decision was grounded in evidence of prior successful transitions of a number of mentally retarded residents from residential settings, from the past closing of other ICFs. Further, the Commonwealth was cognizant of national trends toward deinstitutionalization and the need for certainty in planning matters such as personnel placement. The legislature required DMR to reduce capacity at these ICFs, provided that equal or better services for residents could be furnished in community settings.

Another consideration for the Commonwealth was how to use its available resources for the care of the mentally retarded. DMR had received estimates in 2001 for the amount of capital expenditures needed to maintain each ICF. As of 2001, Fernald needed $14.3 million in capital expenditures to repair its infrastructure and $41.2 million to achieve full compliance with the ADA. The Fernald facility was ranked first among the Commonwealth's ICFs in needed capital costs. Indeed, the average daily cost of services at Fernald as of FY 2007 was over $700 per

person a day, or $259,000 per person annually.[3]  By contrast the costs at the other ICFs ranged from $433 to $590 per day.  The Fernald per-resident cost was also more than 2.5 times the average annual per-person cost of residential community-based services.  In 2007, these were at $280 per day or $102,103 annually per patient, including day programs and transportation services.

As of May 2007, there were 186 Fernald residents living in a facility that once housed nearly 2,000 individuals.  The remaining residents included 131 in the profound range of mental retardation, 40 in the severe range, 12 in the moderate range, and 3 in the mild range.  Fernald Center residents  ranged in age from 36 to 95 years old, with an average age of 57.  Some 38 Fernald Center residents were aged 63 or older.

In 2003, as said, the Commonwealth announced its intention to close Fernald by transferring its residents to equal or better care in its other five ICFs or into community based settings, including group homes.[4]  The Commonwealth planned to keep open at the Fernald campus a 24-person residential unit and a skilled nursing center which can serve 29 individuals.  It began its program in 2003 and has successfully transferred 49 of approximately 238 residents.  Of these, 35 residents were

---

[3]    These figures in part reflect the reduced population at Fernald due to the earlier transfers of residents.

[4]    This was a general policy announcement, which was not accompanied by a formal timetable to close Fernald.

transferred to other ICFs and 14 were transferred to community residences.

The efforts of the Commonwealth to make these transfers were brought to a halt in February 2006 when, as described above, the federal district court, acting at the behest of a purported class of the remaining 189 Fernald residents, enjoined the process pending further investigation.

B.        The History of the Ricci Class Action

In 1972, residents of the Belchertown State School, a state institution for the mentally retarded, filed a class action against state officials alleging that conditions there violated their constitutional and statutory rights.  See Ricci I, 537 F. Supp. at 819; see also Ricci III, 823 F. Supp. at 985-86.  A class action challenge to conditions at Fernald was filed on July 23, 1974.  Complaint, McEvoy v. Goldmark, No. C.A. 74-2768-T (D. Mass. July 23, 1974).  Suits were also filed on behalf of residents of other state institutions.  See Ricci I, 537 F. Supp. at 819.  The actions were consolidated before Judge Tauro of the U.S. District Court for the District of Massachusetts.

After the suits were filed, the court took day-long views of conditions at the facilities.  Ricci I, 537 F. Supp. at 820. The court determined that the Commonwealth was not providing the constitutionally required minimum level of care.  The Commonwealth defendants chose not to dispute this and instead "agreed to work

with the plaintiffs and the court to fashion comprehensive remedial programs that would be memorialized in the form of consent decrees." Id. The parties entered into separate interim consent decrees, one for each institution, in 1977, and a consent decree governing personnel in 1978. Id. at 820-21.

The district court actively oversaw the implementation of the consent decrees for almost ten years. See generally Ricci v. Okin, 978 F.2d 764, 764 (1st Cir. 1992). On October 9, 1986, the court entered an order which set out a list of specific tasks for the Commonwealth to accomplish and represented a "step of disengagement" for the court. Id. The order contemplated the court's final disengagement after three years, a term that the parties extended by agreement. Id. at 764-65.

The class action effectively ended in 1993 when the parties entered into a final consent decree, which the district court adopted in a final Disengagement Order.

C.       The Disengagement Order

On May 25, 1993, the district court signed an order "closing the federal court's oversight of the[] [consolidated] cases." Ricci III, 823 F. Supp. at 985. The Disengagement Order, which supplanted and replaced all prior consent decrees and court orders, adopted the parties' final consent decree. Several provisions of the Disengagement Order are important for purposes of these appeals.

-10-

First, the Disengagement Order terminated the court's jurisdiction over the cases. The cases could be reopened and jurisdiction could be asserted only if certain explicit conditions were met. The Order allowed "action[s] to enforce the rights of the plaintiff classes" only when they were brought "pursuant to the terms of paragraph 7" of the Order. Id. at 986 (Disengagement Order ¶ 1).

Paragraph 7, in turn, allowed class members to seek enforcement of the Disengagement Order if one or more of three conditions had been met. Plaintiffs were required to show that 1) "defendants substantially fail[ed] to provide a state ISP process in compliance with [the] Order"; 2) defendants engaged in "a systemic failure to provide services to class members as described in [the] Order"; or 3) defendants engaged in "a systemic failure to provide ISP services required by [the] Order." Id. at 988 (Disengagement Order ¶ 7). The Order did not, however, allow plaintiffs to reopen "based solely on facts known by them as of the date of [the] Order." Id. It also explicitly prohibited plaintiffs from enforcing the Commonwealth's state law obligations in a federal court action.

Second, the Disengagement Order outlined the obligations DMR owes to class members. Under the Disengagement Order, the Commonwealth may not transfer a class member from a state school to a community residence "until and unless the Superintendent of the

-11-

transferring school . . . certifies that the individual to be transferred will receive equal or better services to meet their needs in the new location, and that all ISP-recommended services for the individual's current needs . . . are available at the new location." Id. at 987 (Disengagement Order ¶ 4). This commits the decision to transfer a resident of Fernald to the Superintendent of Fernald, who makes the certification.

Review of that certification is not in the federal court, but rather through state administrative procedures. See generally 104 Mass. Code Regs. 29.15. Under the applicable regulations, if an individual or guardian objects to the transfer, he or she may file an appeal within 30 days of receipt of the ISP. DMR must attempt to resolve the matter through an informal conference with the client and his or her legally authorized representative. The resident may then petition for a hearing. The individual has the right to be represented at the hearing, to present evidence and call witnesses, and to examine DMR's records. Under state law, "[t]he hearing officer shall determine which placement meets the best interest of the ward giving due consideration to the objections to the placement made by the relative or permanent guardian." Mass. Gen. Laws. ch. 123B, § 3. The objecting party may then seek judicial review of the hearing officer's decision through appeal to superior court. See Mass. Gen. Laws. ch. 30A, § 14. There is no claim in this case that the Superintendent has

-12-

failed to make such certifications for prior transfers from Fernald or will fail to do so for future transfers.

Third, the Disengagement Order details the Commonwealth's obligations with regard to the ISP process. An ISP details each resident's "capabilities and needs for services" such as medical or psychological care. Ricci III, 823 F. Supp. at 986-87 (Disengagement Order ¶ 2(a)); see generally 104 Mass. Code Regs. 29.06(2). ISPs are drafted after individual meetings between evaluating professionals and clients and their guardians. See 104 Mass. Code Regs. 29.06(2)(b). The Disengagement Order required DMR to comply with state regulations governing ISP planning and mandated that any changes to the Commonwealth's ISP regulations continue to "guarantee that each class member be provided with the least restrictive, most normal, appropriate residential environment." Ricci III, 823 F. Supp. at 987 n.2; see also 104 Mass. Code Regs. 29.06(2)(a)(2).

D.        The Motions to Reopen

The Ricci class members filed a motion to reopen the case in 2004. The Massachusetts Association for Retarded Citizens, Inc. appeared as a class representative for the Wrentham and Dever plaintiff classes, who had not been included in the Ricci class members' motion to reopen but had separately alleged that DMR was not in substantial compliance with the Disengagement Order. It ultimately filed a notice of appeal from the district court's

August 17, 2007 order.  As a result, we have two appeals before us from the same district court order.  The Ricci class members based their 2004 motion to reopen on the Commonwealth's alleged violation of the Disengagement Order.  Specifically, they claimed that the Commonwealth had "substantially failed to provide a state ISP process in compliance with the Order," had engaged in "a systemic failure to provide services to class members as described in the Order," and were "not in substantial compliance with the Order with regard to systemic issues."  Motion to Reopen and Restore Case to Active Docket and Enforce the Final Order of May 12, 1993, at 1, Ricci IV, 499 F. Supp. 2d 89 (D. Mass. 2007) (Nos. 72-0469-T, etc.).[5]  As noted, the court appointed a special monitor to investigate the allegations raised in the plaintiffs' motion and their reports to the court.

E.        The Monitor's Report

The court monitor completed a 13-month investigation into the transfers from Fernald between February 26, 2003 and February 8, 2006.  The monitor reviewed all of DMR's records for the transferred individuals and interviewed most of the individuals or their guardians.  The monitor also visited the individuals' new placements as well as all of DMR's ICFs and many of the locations for community placement.  In addition, the monitor hired

_____

[5]    Plaintiff Wrentham Association filed a similar motion on February 7, 2006.  The motion contained similar allegations and was premised on similar grounds.

independent medical professionals to assess each individual whose transfer was planned, in order to review whether these individuals would receive "equal or better" services in the new location.

The monitor reviewed allegations that DMR had violated the Disengagement Order's requirement that it "certify[] that individuals to be transferred will receive equal or better services at their new residences" and "certify[] that ISP recommended services for the individual's current needs are available at the new location." The monitor's report concluded that DMR had complied with both obligations.

The report also found DMR to be in compliance with its procedural obligations under state law, such as the requirement it provide notice to guardians forty-five days in advance of a transfer and the requirement that it ensure guardians knew they had a right to visit and examine the proposed homes. The report also found no violations by DMR of federal regulations, such as 42 C.F.R. § 483.12, which governs transfer standards for skilled nursing facilities. Finally, the monitor found no violation of state regulations governing informed consent. See 115 Mass. Code Regs. 5.08(1)(a).

In addition, the monitor examined conditions at the Commonwealth's other ICF facilities, to which Fernald residents could be transferred. The monitor concluded that "[e]ach facility

currently ha[d] the minimum services, staffing and amenities to provide equal or better services."

The monitor's report also inquired into guardians' assessments of their satisfaction with the resulting placement and their participation in the transfer decision. The monitor reported the results of a survey distributed to guardians of the 49 transferees. Guardians were asked to rate their satisfaction with their wards' placements on a scale of one to five, with one being the most favorable. The results showed 78% rated their satisfaction as a "1," 14% rated their satisfaction a "2," 1% rated their satisfaction a "4," and another 1% rated their satisfaction a "5."

Thus, the monitor's report concluded that the DMR had complied with the Disengagement Order and state and federal law in effectuating past transfers of residents from Fernald.

As to future transfers, the report offered the monitor's opinion that:

> As a result of a year long investigation, our office has concluded that some of the residents at Fernald could suffer an adverse impact, either emotionally and/or physically, if they were forced to transfer from Fernald to another ICF/MR or to a community residence.
> . . . Fernald residents should be allowed to remain at the Fernald facility, since for some, many or most, any other place would not meet an "equal or better" outcome.

-16-

Report of Court Monitor Michael J. Sullivan at 27, Ricci IV, 499 F. Supp. 2d 89 (D. Mass. 2007) (No. 72-0469-T) [hereinafter "Monitor's Report"]. The monitor stated his opinion that "residents should continue to have the opportunity and option to move from Fernald to other ICFs, or to a community residence, provided that the Certification Process is enforced" but that "Fernald residents should be allowed to remain at the Fernald facility." The monitor also suggested that Fernald could be changed by reducing the facility's acreage, building new residential units, and consolidating residences.

F.      The District Court's August 14, 2007 Order

The district court reviewed the monitor's report, affirmed the monitor's finding that there had been no past violation of the Disengagement Order, and agreed that "[f]or some Fernald residents, a transfer 'could have devastating effects that unravel years of positive, non-abusive behavior.'" Ricci IV, 499 F. Supp. 2d at 91 (quoting Monitor's Report at 24). The court concluded that "the Commonwealth's stated global policy judgment that Fernald should be closed ha[d] damaged the Commonwealth's ability to adequately assess the needs of the Fernald residents on an individual, as opposed to a wholesale basis." Id. (footnote omitted).

On this basis, the court held that a necessary condition for federal court intervention -- that the Commonwealth had engaged

in a "'systemic failure' to provide a compliant ISP process" -- had been met. Id. at 91. The court issued a mandatory injunction to remedy this failure:

> Any further communication from Defendant Commonwealth of Massachusetts Department of Mental Retardation to Fernald residents and their guardians which solicits choices for further residential placement shall include Fernald among the options which residents and guardians may rank when expressing their preferences.

Id. at 92. The court administratively closed the case and the Commonwealth appealed.

## II.

The Commonwealth argues that there was no basis on which the court could assert jurisdiction over the matter and asks that the action be dismissed.[6]

The Commonwealth argues that there are three bases on which the court might have authority to reopen, but says none is present here. Those bases are "the defendants' failure to abide by the terms of the [Disengagement Order]; an ongoing violation of the Constitution; or a significant change in either the factual circumstances or the law." The first basis arises from the terms

---

[6] Even if the district court did have authority, the Commonwealth argues, the August 2007 order was improper because: (1) it exceeded the bounds of the 1993 Disengagement Order; (2) it improperly issued a mandatory injunction when neither federal law nor the Disengagement Order had been violated; and (3) it effectively mandated that the Commonwealth keep Fernald open indefinitely, which is beyond the power of a federal court. We do not reach those arguments.

of the Disengagement Order itself. See Ricci III, 823 F. Supp. at 988 (Disengagement Order ¶ 7). The second condition requires that there be a finding of a violation of a federal constitutional provision, thus providing a basis to issue a decree, but the decree "must directly address and relate to the constitutional violation," Milliken v. Bradley, 433 U.S. 267, 281-82 (1977); see also Lovell v. Brennan, 728 F.2d 560, 564 (1st Cir. 1984) (noting that a court may exercise continuing jurisdiction in a case if it finds a constitutional violation or the likelihood of a constitutional violation in the near future). The third and final condition represents the "traditional power of a court of equity to modify its decree in light of changed circumstances," Frew ex rel. Frew v. Hawkins, 540 U.S. 431, 441 (2004), subject to the strict limits the Supreme Court has imposed for finding such modifications.[7]

The district court based its authority to issue the order on the first condition: a purported violation under the terms of paragraph 7 of the Disengagement Order. Plaintiffs urge affirmance on that ground but argue the order is supportable on the other two.

We conclude that the district court does not have authority to reopen the case on any permissible basis. We explain.

---

[7] The plaintiffs argue that the court's conclusion that it had authority to reopen can also be justified as an exercise of its "ancillary jurisdiction" or "inherent jurisdiction." We discuss this argument later.

-19-

A.          Whether the Consent Decree Provided Authority to Reopen
            the Case

The Disengagement Order allows class members to seek enforcement of the defendants' obligations in federal court "[i]f the defendants substantially fail to provide a state ISP process" as detailed in the Disengagement Order or "if there is a systemic failure to provide services to class members." Ricci III, 823 F. Supp. at 988 (Disengagement Order ¶ 7). The district court held that the Commonwealth's administration of the ISP process under its global closure policy "amount[ed] to a 'systemic failure' to provide a compliant ISP process" within the meaning of the 1993 consent decree. Ricci IV, 499 F. Supp. 2d at 91.

The terms of the consent decree embodied in the Disengagement Order, like any contract construction issue, present an issue of law that we review de novo. See generally F.A.C., Inc. v. Cooperativa de Seguros de Vida de P.R., 449 F.3d 185, 192 (1st Cir. 2006). Our view of the proper construction is different from the district court's.

Several provisions of the Disengagement Order are important. First, the Order plainly contemplated that DMR, in its discretion, would be able to close institutions.[8] Ricci III, 823

---

[8] In 1993, years before it issued the August 2007 order, the district court recognized the Disengagement Order did not prohibit the closing of any facility. Ricci III, 823 F. Supp. at 987 ("[N]othing in this Order is intended to detract from or limit the discretion of the defendants in . . . allocating its resources to ensure equitable treatment of its citizens."). It also

F. Supp. at 987 (Disengagement Order ¶ 5). Second, the Order does not permit state law, including the ISP regulations or review of the Superintendent's certification decision, to become enforceable in the federal court. Id. at 988 (Disengagement Order ¶ 7(b)). Thus, the Disengagement Order preserved to DMR the discretion to "allocat[e] its resources to ensure equitable treatment of its citizens without federal court interference." Id. at 987 (Disengagement Order ¶ 5).

The defendants' practices under the Disengagement Order, as the monitor found, were consistent with the terms of the Order. In fact, DMR had earlier closed two residential facilities, the Dever School in 1992 and the Belchertown School in 2002. The parties had agreed to the consent decree against the background of a 1991 policy announcement by then-Governor William Weld that several DMR facilities would be consolidated and that the Dever School would be closed within three years. See generally Ricci II, 781 F. Supp. at 827 & n.3. So long as equal or better services remain available for each resident elsewhere, the closing of one residential facility such as Fernald cannot itself constitute a violation of the Disengagement Order.

---

acknowledged in 1992 that DMR could close any facility. See Ricci v. Okin (Ricci II), 781 F. Supp. 826, 827-28 (D. Mass. 1992) ("The court is not opposed to the eventual closing of Dever or any other [pre-1993] Consent Decree facility."); see also Ricci IV, 499 F. Supp. 2d at 92 n.17 ("The court maintains [the position articulated in 1992].").

-21-

There is also no basis for a conclusion that the Commonwealth has failed to meet the conditions it agreed to meet as to how it goes about providing care to class members. Centrally, the Commonwealth is required to undertake an ISP process that outlines the services each individual class member needs. See generally Ricci III, 823 F. Supp. at 986-87 (Disengagement Order ¶ 2). Again, the record contains no evidence that DMR failed to discharge its ISP duties for any Fernald resident between 2003, when the policy was announced, and 2007. To the contrary, the monitor found that DMR had complied with its obligations in that period.

The district court nevertheless concluded that the Commonwealth's operation of the ISP process against the background of its policy decision to close Fernald constituted a systemic failure. The court reasoned that in announcing its intention to close Fernald, the Commonwealth "eviscerate[d] [the] opportunity for fully informed individualized oversight," "dismiss[ed] the benefit of hearing the voices and wishes of those most directly impacted," and "deprive[d] the DMR itself of valuable information, thereby undermining the efficacy of the ISP process." Ricci IV, 499 F. Supp. 2d at 91. Given that the monitor found and the court accepted that the transfer of 49 patients after the 2003 announcement fully complied with the Disengagement Order, it cannot follow that the fact of the announcement caused a systemic failure.

Indeed, the 2003 announcement was not the first but one of several announcements made of a closing or phase-down of a DMR institution over a 15-year period. The pre-2003 announcements did not cause there to be systemic failures or damage the plaintiffs' ability adequately to participate in the ISP process, nor did the 2003 announcement. The monitor found there had been full compliance with the consent decree as to these earlier closings of facilities.

Further, the Disengagement Order requires the defendants to follow an ISP process but does not predetermine the placement which will result at the end of the ISP process. The Disengagement Order, by its terms, does not guarantee any class member any particular residential placement, nor does it guarantee that Fernald be maintained open so long as any particular resident prefers to remain there.

This, in turn, has several consequences. The removal of one of several available residential facilities which have been found to comply fully with the Disengagement Order cannot itself result in there being a violation of the ISP process. Further, the very nature of the ISP process itself contradicts the district court's conclusion. As the Commonwealth notes, the ISP process focuses only on the services a resident is to receive; the ISP process does not specify where those services are to be delivered. See generally 115 Mass. Code Regs. 6.20-6.25; cf. Ricci II, 781 F. Supp. at 827 n.4 (noting, in discussing ISP process for Dever

residents, that "[r]ecommendation[s] as to residential and program placement are based on evaluation of the actual needs of the resident or client rather than on what facilities and programs are currently available").

The Commonwealth also argues that its closing of Fernald could have no effect on the ISP process in the future because the Commonwealth and the class members entered into a stipulation, filed with the court on December 29, 2004, that included an agreement that:

> The Department, its representatives, and employees shall not discuss alternative placement . . . for individuals at Fernald during the team meeting convened to develop the individual's annual ISP. The annual ISP meeting shall be limited to the identification and recording of the individual's current needs and supports. The description of an individual's needs and supports as defined in the ISP shall be independent of any discussion regarding where the individual currently lives or what level or type of staffing exists there, and shall be based solely upon professional and direct care assessments done by persons in their assigned roles.

Stipulation at 1, <u>Ricci IV</u>, 499 F. Supp. 2d 89 (D. Mass. 2007) (Nos. 72-0469-T, etc.) (citations omitted). As the Commonwealth points out, the stipulation creates even further distance between discussions of placement and the ISP process.

Further, the district court's injunction did not rest on the likelihood that the remaining Fernald residents systemically would be transferred into a location that was not "equal to or

-24-

better" than Fernald. There is no basis in the record for such a conclusion. The monitor found that the other residential facilities were at least equal to Fernald. Rather, the court concluded that the systemic failure consisted of "[a]dministering [the ISP] process under the global declaration that Fernald will be closed." Ricci IV, 499 F. Supp. 2d at 91. Under the Disengagement Order, the question of whether a transfer will result in an equal or better placement is separate from the question whether the Commonwealth has correctly implemented the ISP process. The section of the Disengagement Order which deals with transfers states:

> Defendants shall not approve a transfer of any class member out of a state school into the community, or from one community residence to another such residence, until and unless the Superintendent of the transferring school (or the Regional Director of the pertinent community region) certifies that the individual to be transferred will receive equal or better services to meet their needs in the new location, and that all ISP-recommended services for the individual's current needs as identified in the ISP are available at the new location.

Ricci III, 823 F. Supp. at 987 (Disengagement Order ¶ 4) (emphasis added). Under the language of the Disengagement Order, a resident may not be transferred to a new location until the Superintendent certifies that the location can satisfactorily provide all ISP-recommended services. This individualized process, that the Commonwealth has followed, cannot constitute a "'systemic failure'

-25-

to provide a compliant ISP process." The legal premise for the court's conclusion was in error.

The plaintiff class members have expressed their concerns that the outcome of the ISP process for the remaining Fernald residents will not result in their receiving equal or better services.[9] That determination, by its nature, must be made on an individual basis. The Disengagement Order and state regulations provide a procedure and a place where individual disputes about adequacy of the services resulting from the ISP process may be heard. See generally 104 Mass. Code Regs. 29.15. Again, the Disengagement Order commits these disputes to resolution in a state forum and under state law and thus provides no basis for federal court intervention. A resident who is the subject of the ISP process may request a conference and an adjudicatory hearing, which includes procedural safeguards and the right to judicial review in the state Superior Court.

If in an individual case there is a failure to provide through the ISP process "an individualized and personalized analysis of each resident," a concern expressed by the district court, then the remedy is provided by state regulations, which inform the ISP process. See generally 115 Mass. Code Regs. 6.25.

---

[9] Plaintiff Wrentham Association argues that the record shows there was intimidation of residents. Neither the district court nor the monitor found any intimidation during the relevant period and the record does not sustain the accusation.

This concern then, does not satisfy the conditions for reopening the decree or warrant federal intervention in state proceedings.

The conditions precedent set forth in the Disengagement Order for the court to reopen the case have not been met and the court erred in concluding otherwise.

B.     Whether There Was Authority Under the Modification Doctrine

In reopening the consent decree, the district court did not rely on the doctrine that in limited circumstances, consent decrees in institutional reform cases may be modified.  In fact, this theory was not advanced before the district court.  Several of the briefs advance this modification rationale as an alternative rationale which they argue would support the court's reopening of the decree.  Given the significance of this case, we address the question.  We hold that the plaintiffs have not met and cannot meet their burden to establish that modification is warranted and that the court thus lacked jurisdiction to modify the consent decree.

In Rufo v. Inmates of Suffolk County Jail, 502 U.S. 367 (1992), the Supreme Court set forth the standards that apply when "a party seeks modification of a term of a consent decree that arguably relates to the vindication of a constitutional right." Id. at 383 n.7.  The district court can modify the decree only on a showing of a significant change in circumstances.  Id. at 383. The party seeking modification has the burden of showing "a

significant change either in factual conditions or in law." Id. at 384.

There is no justification in the modification rationale under Rufo to reopen the consent decree.[10] There has been no significant change in factual circumstances. The parties, and the Disengagement Order, recognized that the Commonwealth might choose to close any of the residential facilities, including Fernald. There has also been no significant change in law which would warrant reopening the decree. Indeed, the law has moved in a direction disfavoring institutionalization of residents. The Commonwealth cites Olmstead as recognizing that federal law now favors community placement of institutionalized individuals.[11] In addition, the Commonwealth notes that law of neighboring states, including Maine, New Hampshire, and Rhode Island, has moved away from institutionalization completely.

---

[10] We do not need to reach the preliminary question of whether the modification doctrine can apply at all when the parties have in a consent decree defined the conditions for reopening.

[11] Amici, Massachusetts Coalition of Families and Advocates for the Retarded, Inc. and Voice of the Retarded, Inc., filed a brief in this court in support of appellees that argues to the contrary that the core holding of Olmstead does not endorse deinstitutionalization but requires an individualized assessment that considers "the views of treatment professionals; the views of the affected individual; and state resources." Amici, the Association of Developmental Disabilities Providers of Massachusetts and others, filed a brief in support of appellants. They argue that there has been a paradigm shift throughout the nation in favor of deinstitutionalization.
We note but have no need to address these different views.

C.        Whether There Was Authority to Reopnen Due to Constitutional Violations

The plaintiffs argue that there is a separate basis to be found in the Constitution, which would support the district court's assertion of jurisdiction.  They argue that there has and will be a violation of the residents' due process rights.  The district court wisely did not rely on this ground.  There is no basis in the record for this assertion.  The record is to the contrary

The plaintiffs allege that "a process that would permit the transfer of residents from Fernald without [allowing them] meaningful participation" violates principles of due process.  But the record does not show that there has been a "lack of meaningful participation."  The record provides no basis to infer, much less to demonstrate, that there will be a lack of meaningful participation.  The monitor made no findings that DMR had prevented residents or guardians involved in transfers between 2003 and 2006 from participating meaningfully in discussions of their transfer.  The findings are that there was full compliance with the Commonwealth's obligations.

D.        Whether Other Grounds Provided Authority to Reopen

This leaves only the attempt of the plaintiff class to recharacterize the district court's assertion of jurisdiction as an exercise of "ancillary jurisdiction."  Plaintiff Wrentham Association makes a related argument that a court has "inherent

authority" to enforce its own orders.[12]  Neither doctrine applies here.

"Ancillary jurisdiction" is a term with a specialized meaning, and the term has no application here.  Nor does the court have "inherent authority" to revisit its Disengagement Order.  In Kokkonen v. Guardian Life Insurance Co. of America, 511 U.S. 375 (1994), the Court explained that ancillary jurisdiction can be used for two limited purposes: "(1) to permit disposition by a single court of claims that are, in varying respects and degrees, factually interdependent . . . ; and (2) to enable a court to function successfully, that is, to manage its proceedings, vindicate its authority, and effectuate its decrees." Id. at 379-80 (citations omitted).  In discussing the second purpose, the Court noted that a district court may possess "inherent authority" to address violations of an order where it retains jurisdiction in a separate provision, but only when the order itself is violated. See id. at 380-81.  The Court found that neither power justified federal court jurisdiction to revisit a settlement agreement between two parties where the court order did not contain a provision retaining jurisdiction.  Kokkonen thus stands for the

---

[12]    The Wrentham Association argues that, in addition to its inherent authority, the district court explicitly retained jurisdiction here. Any jurisdiction retained in the Disengagement Order, however, could be activated only after certain conditions precedent, such as a showing of a systemic failure of the ISP process, were met.

-30-

proposition "that district courts enjoy no free-ranging 'ancillary' jurisdiction to enforce consent decrees, but are instead constrained by the terms of the decree and related order." Pigford v. Veneman, 292 F.3d 918, 924 (D.C. Cir. 2002) (citing Kokkonen, 511 U.S. at 381). The district court's ancillary jurisdiction thus did not provide authority to reopen the Disengagement Order absent a showing, not sustainable here, that the terms of the Disengagement Order itself had been violated.

                              III.

        The issue this court decides concerns the limits on the jurisdiction of the federal courts. We do not decide the issue of what path best serves the interests of the residents of Fernald and the other parties who have a stake in this matter. People of good faith can and do passionately differ about the Commonwealth's intention to close the Fernald Center. We hold only that the district court lacked authority to reopen the consent decree in this case and that it lacked jurisdiction on that or any other basis to reopen and to enter the orders it did.

        We reverse and direct entry of judgment dismissing with prejudice the claims plaintiffs have brought in this action. In doing so, we also recognize the able stewardship exercised by the district court over the years, which led to the improvement of conditions for the Fernald residents and to the landmark 1993 consent decree.

It is so ordered.