P.D.[1] *vs.* DEPARTMENT OF DEVELOPMENTAL SERVICES
& another.[2]

No. 12-P-1460.

Middlesex. June 11, 2013. - February 18, 2014.

Present: BERRY, KATZMANN, & RUBIN, JJ.

*Department of Developmental Services. Intellectually Disabled Person.
Administrative Law,* Hearing, Findings, Substantial evidence. *Notice.*

[1]By his coguardians, Susan Surette and Patricia Beaulieu.
[2]Division of Administrative Law Appeals.

Administrative Law Appeals (division) did not err in ruling that the division lacked jurisdiction to decide the plaintiff's guardians' Federal law claims. [830]

CIVIL ACTION commenced in the Superior Court Department on August 10, 2011.

The case was heard by *Kathe M. Tuttman*, J., on a motion for judgment on the pleadings.

*Stephen M. Sheehy* for the plaintiff.

*Carrie Benedon*, Assistant Attorney General, for the defendants.

BERRY, J. This involuntary transfer case concerns a proposal by the Department of Developmental Services (DDS) to move P.D., a profoundly intellectually disabled man, from his home at the Fernald Developmental Center (FDC) to Heffron Hall B, apartment 3 (apartment 3) at the Wrentham Developmental Center (WDC). After determining that the transfer would result in improved services and quality of life for P.D. and be in his best interest, an administrative magistrate of the Division of Administrative Law Appeals (DALA) approved the transfer. See G. L. c. 123B, § 3. The guardians appeal from a Superior Court judgment affirming that decision. Concluding, as we do, that the decision was supported by substantial evidence and free from error of law, we affirm.

*Substantial evidence.* The magistrate's ultimate conclusion that the transfer would result in improved services and quality of life for P.D. was supported by substantial evidence. See G. L. c. 30A, § 14(7); *G.R.* v. *Department of Developmental Servs.*, *ante* 791, 794 (2014). In determining whether the transfer should proceed as in P.D.'s best interest, the magistrate properly examined the over-all picture, comparing the supports and services available at the respective facilities to meet P.D.'s unique needs. He also carefully considered the guardians' many objections, as required by the statute, and rejected them as invalid or unreviewable, or valid but outweighed by other factors or adequately addressed by DDS.

P.D. has lived at FDC for most of his life. His primary medical and psychiatric issues are sever pica (ingesting nonfood

items), skin picking, hyperactivity, a swallowing disorder, and both obsessive-compulsive disorder and bipolar disorder. These conditions are addressed in his individual support/service plan (ISP).

In his decision, the magistrate identified the seven distinct improvements in services and quality of life that DDS asserted would be available to P.D. at WDC, which the magistrate grouped into four categories: (1) reunification with former housemates and familiar FDC direct care and professional staff; (2) a greater variety and number of social, leisure, and recreational activities; (3) better medical and psychological services; and (4) more stability and predictability at a facility that will remain open after FDC closes. The magistrate agreed with DDS regarding the second alleged benefit and part of the third.

On balance, the magistrate's conclusion that the *tangible* benefit to P.D. from WDC's "more robust recreational, social and leisure offerings," in combination with the minor improvement in medical services, warranted the transfer.[3] As the magistrate found, "activity in general tends to divert [P.D]. from pica and skin-picking, and keeping him occupied is one of the forms of proactive intervention employed to address this behavior. . . ." The magistrate further found that "it is possible that one or more of the additional activities Wrentham offers would augment this critical behavioral diversion. [P.D.]'s ISP[4] is read properly as encouraging that a range of activities be offered to him. Wrentham's wider variety of recreational, social and leisure activities make it possible for this to be accomplished. In terms of offering additional opportunities for diversions from pica and self-injuring behavior, and in terms of meeting the ISP objective as to a participation in a broad range of activities, Wrentham's wider variety of recreational, social,

---

[3]The magistrate found that the availability of twenty-four hour nursing in apartment 3 and acute care at WDC's May Center "would effect, at best, a minimal improvement in the medical services [P.D.] is receiving at Fernald."

[4]P.D.'s ISP, a document approved by the guardians, identified P.D.'s needs to expend physical energy in constructive ways; to exercise in the pool on a weekly basis; and to maintain his participation in a broad range of community activities as important to his affective, sensorimotor and social development. The magistrate also interpreted the ISP to not only encourage, but to direct, that P.D. be offered additional activities.

and leisure activities show that the proposed transfer would improve P.D.'s services and quality of life and that the transfer would be in his best interest."[5] In assessing the weight to be given to this one improvement, the magistrate concluded "[b]ecause activities in general are *critical* to diverting P.D. away from pica and self-injuring behavior, and because P.D.'s ISP identifies participation in activities as a functional need and as related to his sensorimotor and social development, this benefit stands out in the overall picture that emerges from the record, predominantly so in comparison to other asserted benefits that proved to be negligible or hypothetical" (emphasis supplied). These findings provide substantial evidence in support of the transfer.

Although the magistrate found that the entire reunification benefit identified by DDS was "theoretical" or "hypothetical," there may be benefits from the probable reunification with certain direct care and professional staff that provide additional support for the magistrate's decision.[6] As the magistrate noted, three of P.D.'s familiar caregivers now work at WDC and two others, who apparently work in the multi-apartment Heffron Halls, have applied to work in apartment 3. The magistrate specifically found that "[i]t would likely be of significant benefit to P.D. if these familiar Fernald direct care staff were assigned to work with him at Heffron Hall B, apartment 3." While the magistrate correctly pointed out that there was no evidence that the two caregivers who have applied to work in apartment 3 will be transferred there, the undisputed evidence demonstrated that two others are already assigned to and working in apartment 3.[7] This significant benefit to P.D. of the availability of

---

[5]The magistrate found that P.D. enjoys walking, using the pool, his work program, eating, van rides, bingo, playing with mega-building blocks, flipping through magazines, music and singing, and receiving hugs and attention from familiar staff and family members. It is undisputed that WDC offers a much greater variety and frequency of recreational, social, and leisure activities than FDC.

[6]The reunification benefit had three aspects (housemates, direct care staff, and professional staff). The magistrate was warranted in finding that the benefit of reunification with his housemates was theoretical. P.D. generally does not interact with his housemates and has not formed meaningful relationships with anyone other than his guardians and direct care givers.

[7]Coguardian Susan Surette testified that she was aware that two familiar

these familiar direct care staff in apartment 3 supported the magistrate's ultimate determination.

Addressing the benefit of reunification with familiar professional staff, the magistrate found that "[t]he assignment of both a QMRP [Qualified Mental Retardation Professional or 'Q'] and a psychology assistant assigned [*sic*] to P.D. would . . . improve the psychological services he receives currently, particularly if both of them have worked with P.D. and are familiar with his pica self-injurious behavior and psychological and medical profiles." However, the magistrate found that "[i]t is not clear that this team will actually coalesce at Wrentham. It appears reasonably certain that Mr. [Rick] Tulipano [a former, familiar QMRP who works at Heffron Hall B] would be P.D.'s assigned QMRP . . . . It is not certain, however, that Mr. [Anthony] Gabriesheski will remain assigned to P.D. if he is transferred to Wrentham." The record demonstrates, however, that as of the date of the hearing, Gabriesheski is slated to provide those services to P.D. in apartment 3.[8,9]

In short, an examination of the record established that the proposed transfer to WDC will most probably offer several benefits and improvements, in addition to those identified by the magistrate, including reunification or continuity of services with familiar direct care and professional staff and better psychological services, as well as those identified by the magistrate including a greater variety and number of activities

direct care staff are working in apartment 3. According to Mary Ann Killilea, the guardians' own witness and P.D.'s longterm caregiver, the availability of these two familiar direct care workers would benefit P.D.

[8]The magistrate found that "[a] more robust psychology staff is unquestionably critical to P.D.'s well-being. . . . Gabriesheski is unquestionably one of P.D.'s familiar professional caregivers, and he has played an important and direct role in the successful management of P.D.'s behavioral problems at Fernald, including the reduction of P.D.'s pica to 'basically zero,' by the time of the hearing in this matter. . . . P.D.'s psychology services would improve if Mr. Gabriesheski remained as his psychology assistant and P.D.'s former QMRP (Mr. Tulipano, who is already working at Heffron Hall B) joined P.D.'s professional direct care team."

[9]In the case of *E.G.* v. *Department of Developmental Servs.*, *post* 831, 833 n.7 (2014), the magistrate found that Gabriesheski's provision of services to E.G. will be a benefit to him. It seems highly unlikely that Gabriesheski will provide services to E.G., P.D.'s anticipated apartment mate, but not to P.D.

critical to diverting P.D. from pica and self-injurious behavior and improved medical services.

*Additional concerns expressed by the guardians.* The guardians based one of their arguments that the transfer was not in P.D.'s best interest on an unduly limited excerpt from the magistrate's decision. In addressing the guardians' serious concern that the crowding situation will exacerbate P.D.'s pica and self-injurious behavior, the magistrate did state that P.D. "cannot be forced to fit into apartment 3."[10] However, the magistrate did not find that apartment 3 was unsafe or inadequate to meet P.D.'s needs. He credited testimony from members of P.D.'s ISP team who have successfully managed his neuropsychiatric issues that P.D. would adjust to the new residence with the assistance of staff.

Contrary to the guardians' assertions, the magistrate did not find that the proposed placement in apartment 3 "presented significant risks of undermining P.D.'s stability and exacerbating his self-injurious and aggressive behaviors." Nor did the magistrate find, as the guardians assert, that the "physical design of the apartment presented significant risks to [P.D.]'s safety." The magistrate found rather that it is "almost impossible" to predict whether the space constraints will affect P.D.'s behavior and if so, how.[11] Even the guardians acknowledge that DDS cannot absolutely guarantee P.D.'s safety. Given the many variables and unknown facts, the magistrate appropriately directed DDS staff to evaluate the safety and adequacy of the space for P.D. as the transition is implemented (and if necessary, to craft

---

[10]In light of the ongoing transfers, both P.D.'s residence at FDC and apartment 3 are half-full. Upon completion of the transfers, P.D. would live with the same number of men until recent changes were made, but in a smaller space. The magistrate found that seven residents with their direct care staff "may crowd this smaller space noticeably."

[11]On the one hand, P.D. historically has had good relations with the group of men with whom he is scheduled to live, his former and present longterm housemates from FDC; he also enjoys being around people; and he has a one-to-one direct care worker shadowing him to keep him safe. On the other hand, he generally does not interact with his peers. He is also easily agitated around unfamiliar staff. At times, such as when P.D. is sad or frustrated, he can become uncooperative, unpredictable, and aggressive and may engage in self-injurious behavior.

an effective solution to any problem noted within a reasonable time).[12]

*Statutory notice.* Even if the content of DDS's forty-five day notice failed to comply with G. L. c. 123B, § 3, and 115 Code Mass. Regs. § 6.63(2)(c) (2009), the guardians have not demonstrated possible prejudice to their substantial rights. See G. L. c. 30A, § 14(7); *Molly A.* v. *Commissioner of the Dept. of Mental Retardation*, 69 Mass. App. Ct. 267, 287 n.28 (2007). See also *M.D.* v. *Department of Developmental Servs.*, 83 Mass. App. Ct. 463, 470-472 (2013) (*M.D.*). As the magistrate found, it did not matter how many details or points of comparison were included in the notice; the guardians were going to object to the proposed transfer to WDC.[13] *Id.* at 471-472. Moreover, the purposes of the notice provision were met. See *id.* at 470-472. The guardians were able to submit a timely and comprehensive objection to the proposed transfer as required by the statute; and they have not identified any way in which the allegedly inadequate notice compromised their ability to prepare their case for an adjudicatory hearing. Finally, there was nothing improper in the magistrate's suggestion in his prehearing orders about how he would likely rule on the issue. The magistrate's eighty-three page decision, including eight pages of analysis on the notice issue alone, belies any contention that he failed to apply the provisions of the transfer statute to P.D.'s unique, individual circumstances.

*Process.* The guardians have failed to show any violation of

---

[12]An ISP meeting will be held thirty days after the transfer occurs. Any continuing concerns may be addressed at that time. Even if the magistrate's directive to DDS cannot be specifically enforced, a failure by DDS to properly implement the provisions of P.D.'s ISP, including his right "to safely move about his home" and his safety needs identified in the ISP, may always be challenged. See 115 Code Mass. Regs. § 6.31(9) (2009).

[13]That finding about the guardians' intentions was supported by substantial evidence. In their five-page, single-spaced objection letter, the guardians unequivocally stated that *"[P.D.]'s Individual Support Plan (ISP) can not be implemented at the WDC."* Tracing the history of the *Ricci* litigation, the magistrate further found that the guardians had done all they could to forestall the closure of FDC in the Federal courts and that, notwithstanding the decision of the United States Court of Appeals for the First Circuit in *Ricci* v. *Patrick*, 544 F.3d 8 (1st Cir. 2008), cert. denied, 556 U.S. 1166 (2009) (*Ricci V*), effectively upholding the legality of the closure, they had continued to oppose it.

the *Ricci* mandates[14] or DDS regulations in connection with the placement-planning process or the June 2, 2010, ITP/ISP modification meeting. DDS did not deny the guardians meaningful participation in the placement decision. The evidence established that DDS explored many different placement options for P.D. and consistently encouraged the guardians to participate in the planning process. The central role played by the ISP team in the selection process was clear. As DDS had advised the guardians in correspondence sent after *Ricci V* cleared the path to FDC's closure, in the absence of the guardians' participation, the ISP team would make the placement *recommendation* for P.D. No regulation required DDS to keep a record of the ISP team's informal communications about potential placements or to invite the guardians to participate in them. See *M.D.*, *supra* at 475-476.

To the extent that the guardians complain that the placement decision was made without the meeting of the entire ISP team (of which they are a part), the record established that as required by regulation, DDS invited the guardians, among many others, to the formal ITP/ISP modification meeting.[15] See 115 Code Mass. Regs. §§ 6.21 and 6.25(4)(a) (2009). As evidenced by the attendance record, sixteen individuals attended that meeting. One of the guardians, Susan Surette, attended and was given the opportunity to ask questions about the placement process, the impact of the proposed transfer upon P.D.'s ISP, and the ISP team's placement recommendation, including the alleged improvements available to P.D. at WDC, the appropriateness of apartment 3, the risks to P.D., and other possible placement alternatives. The final transfer decision was not made until after that meeting. See 115 Code Mass. Regs. § 6.25(7) (2009).[16,17]

[14]See *M.D.*, *supra* at 467 n.8, for discussion of *Ricci* class members' rights. P.D. is a *Ricci* class member.

[15]Contrary to the guardians' assertions, there was evidence that Mark Lewis, P.D.'s service coordinator (otherwise known as a QMRP), was involved in the transfer decision. Lewis not only attested to his role in recommending P.D.'s placement at WDC, he participated in the ITP/ISP modification meeting.

[16]The evidence showed that DDS did in fact identify several possible options for P.D. during the earlier stages of the placement-planning process. The guardians rejected all group home placements proposed by DDS as inappropriate. At no point did the guardians indicate to DDS that they were

*Federal law.* The magistrate did not err by ruling that DALA lacked jurisdiction to decide the guardians' Federal law claims. See *M.D.*, *supra* at 466.

The magistrate properly analyzed the restrictiveness claim as it was framed by the guardians below under *Olmstead.* See *Olmstead* v. *L.C. ex rel. Zimring*, 527 U.S. 581 (1999) (*Olmstead*). Since the guardians had rejected all community-based placements and DDS had proposed an interfacility transfer, no principle of *Olmstead* was violated. See *M.D.*, *supra* at 466-467. The guardians' argument that *Olmstead* allows them to reject *any* undesired transfer is based upon a misreading of that case and fails for that reason. See *id.* at 467.[18]

*Conclusion.* We recognize and appreciate that the coguardians are motivated by their deep concern for P.D.'s well-being. We know that P.D.'s transfer to WDC will be a significant adjustment for him and for them. After careful consideration, we conclude that there was substantial evidence to support the magistrate's decision.

The judgment of the Superior Court affirming the decision of DALA to approve P.D.'s transfer is affirmed.

*Judgment affirmed.*

---

willing to consider another placement for P.D. in a different residence within the WDC or a placement at the Hogan Regional Center (the only two intermediate care facilities to remain open under DDS's consolidation plan).

[17]The consideration of more than one alternative placement was discussed in *M.D.*, *supra* at 476 & n.29. We are not persuaded by the guardians' argument.

[18]The guardians have also raised the same certification issue as was raised in *M.D.*, *supra* at 468-469. As we held in that decision, the certification process has no application to this interfacility transfer. *Id.* at 468-469 & n.11.